PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

───────────

No. 10-1818

───────────

UNITED STATES OF AMERICA

v.

THOMAS S. PENDLETON,

Appellant

───────────

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 08-cr-00111)
District Judge:  Honorable Gregory M. Sleet

───────────

Argued February 16, 2011
Before:  SLOVITER and HARDIMAN, *Circuit Judges*
and JONES, II,[*] *District Judge*.

(Filed: September 7, 2011)

─────────────────────

[*] The Honorable C. Darnell Jones, II, District Judge for
the United States District Court for the Eastern District of
Pennsylvania, sitting by designation.

Ilana H. Eisenstein [Argued]
Office of United States Attorney
1007 North Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899-0000

Jennifer Leonardo
United States Department of Justice
Criminal Division, Public Integrity Section
1400 New York Avenue, N.W.
Washington, DC 20530
    *Attorneys for Plaintiff-Appellee*

Eleni Kousoulis
Daniel I. Siegel [Argued]
Office of Federal Public Defender
800 King Street
Suite 200
Wilmington, DE 19801-0000
    *Attorneys for Defendant-Appellant*

_____

OPINION OF THE COURT

_____


HARDIMAN, *Circuit Judge*.

This appeal presents two questions of first impression. First, we consider whether the general criminal venue provision, 18 U.S.C. § 3238, applies when a defendant commits part of his offense inside the United States. Second, we determine whether 18 U.S.C. § 2423(c) and (f)(1), which

2

together criminalize noncommercial illicit sexual conduct outside the United States, is a valid exercise of Congress's power under Article I, Section 8, Clause 3 of the United States Constitution (the Foreign Commerce Clause).

I

On November 25, 2005, Thomas Pendleton boarded a plane in New York City and flew to Hamburg, Germany. Six months after his arrival in Germany, Pendleton sexually molested a fifteen-year-old boy. German authorities arrested Pendleton, and a jury in Hamburg found him guilty of "engaging in sexual acts with a person incapable of resistance." After serving nineteen months in a German prison, Pendleton returned to the United States, where he was arrested and indicted by a federal grand jury in the District of Delaware on one count of engaging in noncommercial illicit sexual conduct in a foreign place, in violation of 18 U.S.C. § 2423(c) and (f)(1).

Adopted in 2003 as part of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act (the PROTECT Act), § 2423(c) provides: "Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both." The statute defines "illicit sexual conduct" in two ways: (1) "a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States;" or (2) "any commercial sex act (as defined in section 1591) with a person under 18 years of age." 18 U.S.C. § 2423(f). Pendleton was indicted under the first

3

subpart of § 2423(f), which criminalizes noncommercial sex with a minor.

Pendleton moved to dismiss the indictment, challenging Congress's authority to regulate noncommercial activity outside the United States under the Foreign Commerce Clause and the Due Process Clause of the Fifth Amendment. The District Court denied Pendleton's motion, holding that 18 U.S.C. § 2423(c) was a valid exercise of Congress's power to regulate the "channels" of foreign commerce.[1] *See United States v. Clark*, 435 F.3d 1100, 1114 (9th Cir. 2006) ("[T]he phrase 'travels in foreign commerce' unequivocally establishes that Congress specifically invoked the Foreign Commerce Clause."). The District Court also held that Pendleton's due process claim was foreclosed by our decision in *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993).[2]

---

[1] The legislative history of the PROTECT Act does not include a statement regarding the source of Congress's authority to enact § 2423(c). *See generally* H.R. REP. NO. 108-66, at 51, *reprinted in* 2003 U.S.C.C.A.N. 683, 686 (Apr. 9, 2003). However, the language of § 2423(c) was adopted verbatim from an earlier bill—the Sex Tourism Prohibition Improvement Act of 2002—which relied on the Foreign Commerce Clause as the basis for its constitutional authority. *See* H.R. REP. NO. 525, at 5, 2002 WL 1376220, at *5 (June 24, 2002).

[2] Pendleton asks us to reexamine *Martinez-Hidalgo*'s holding that no due process violation occurs when Congress criminalizes conduct abroad that is "condemned universally by law-abiding nations." *Id.* at 156. We will not do so

Following a two-day jury trial, Pendleton was convicted of engaging in illicit sexual conduct in Germany in violation of 18 U.S.C. § 2423(c), and he was sentenced to thirty years in prison.[3]  At the close of the Government's case, Pendleton moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a), claiming that he should have been tried in the Eastern District of New York.  The District Court denied the motion, holding that venue was proper in the District of Delaware because Pendleton was arrested there following his return to the United States. *United States v. Pendleton*, 2010 WL 427230, at \*6 (D. Del. Feb. 2, 2010).

---

because a panel of this Court has no authority to overrule a precedential opinion of the Court.  *See Mariana v. Fisher*, 338 F.3d 189, 201 (3d Cir. 2003).

[3] Pendleton also was sentenced to a concurrent term of ten years in prison for failing to register as a sex offender, in violation of the Adam Walsh Child Protection and Safety Act of 2006.  *See United States v. Pendleton*, 636 F.3d 78 (3d Cir. 2011).  Pendleton was first convicted of sexually abusing children in Michigan in 1981 and was sentenced to 24 months probation.  In 1993, a New Jersey jury found Pendleton guilty of various sex crimes against a 12-year-old boy and he was sentenced to seven years in prison.  About three years after his release from prison, Pendleton traveled to Latvia and was convicted there for sex crimes against two children, ages 9 and 13.  A little over a year after Pendleton was released from a Latvian prison he committed the offense at issue in this case.

Pendleton timely appealed the District Court's judgment of sentence and seeks reversal for two reasons: (1) venue was improper in the District of Delaware; and (2) the "noncommercial" prong of 18 U.S.C. § 2423(c) is facially unconstitutional. We consider each argument in turn.

II

Jurisdiction lies over Pendleton's appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3582, and we exercise plenary review over the District Court's venue determination. *United States v. Perez*, 280 F.3d 318, 328-30 (3d Cir. 2002).

As a defendant in a criminal trial, Pendleton has a constitutional right to be tried in the district where his crime was committed. *Id.* at 329 (citing U.S. CONST. amend. VI and U.S. CONST. art. III, § 2, cl. 3). Congress may fix jurisdiction in any district where a "crucial element" of the crime is performed. *Id.* When Congress has "not indicate[d] where it consider[s] the place of committing the crime to be," we determine jurisdiction "from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 n.1 (1999) (citations and internal quotation marks omitted). When the crime consists of distinct acts occurring in different places, venue is proper where any part of the crime occurs. *Id.* (citing *United States v. Lombardo*, 241 U.S. 73, 77 (1916)).

Although the PROTECT Act contains no express venue provision, Pendleton argues that Congress fixed venue for all crimes involving "transportation in foreign commerce" only in those districts where foreign travel commenced. For this proposition, Pendleton cites 18 U.S.C. § 3237(a), which reads in relevant part:

6

Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

Because he boarded the plane to Germany in the Eastern District of New York, Pendleton claimed jurisdiction would have been proper only in that district. The District Court disagreed, writing that "the PROTECT Act contains no directive as to the appropriate venue for the prosecution of those charged under its provisions." Consequently, the Court relied on *Rodriguez-Moreno*'s two-pronged approach to determine venue in this case. *Pendleton*, 2010 WL 427230, at \*6. This was not error.

Contrary to Pendleton's argument, § 3237(a) does not include a mandatory venue provision. Rather, the statute instructs that offenses involving interstate or foreign transportation "*may be* inquired of and prosecuted . . . in the district from . . . which such commerce . . . moves." *Id.* (emphasis added). Accordingly, the Government is not statutorily barred from prosecuting Pendleton in another district if it can show that a portion of his offense was committed there. Moreover, the Constitution does not "'command a single exclusive venue.'" *United States v. Goldberg*, 830 F.2d 459, 466 (3d Cir. 1987) (quoting *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985)). "'The [c]onstitution requires only that the venue chosen be determined from the nature of the crime charged as well as

from the location of the act or acts constituting it, and that it not be contrary to an explicit policy underlying venue law.'" *Id.* (quoting *Reed*, 773 F.2d at 480).

Where, as here, Congress has not designated the venue in the relevant criminal statute, we employ the two-pronged approach set forth in *Rodriguez-Moreno*. *See* 526 U.S. at 279. "A court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *Id.* To identify which conduct "constitutes the offense," we look to Pendleton's crime of conviction, which provides:

> Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

18 U.S.C. § 2423(c). The crime of conviction thus comprises three elements: (1) being a United States citizen or permanent resident; (2) traveling in foreign commerce; and (3) engaging in illicit sexual conduct. *See Clark*, 435 F.3d at 1105 (finding that an American citizen who traveled in foreign commerce to Cambodia and engaged in commercial sex acts with underage boys could be prosecuted under § 2423(c)).

Of these three elements, we agree with the District Court that "engaging in illicit sexual conduct" is the most critical to § 2423(c). Indeed, the title of the offense— "Engaging in Illicit Sexual Conduct in Foreign Places"— describes only this conduct. Moreover, while travel in foreign commerce is an element of § 2423(c), the crime itself

8

is not complete until a person engages in illicit sex. In this regard, § 2423(c) is unlike the crime of "[t]ravel with intent to engage in illicit sexual conduct," defined in § 2423(b), which is complete as soon as one begins to travel with the intent to engage in a sex act with a minor. *See United States v. Bredimus*, 352 F.3d 200, 208, 210 (5th Cir. 2003) ("We find . . . that the criminal act under § 2423(b) is foreign travel with criminal intent; and thus, the offense is complete even if the illicit intent is never realized."). Although § 2423(c) targets the same individuals as does § 2423(b)—namely, persons traveling in commerce for the purpose of engaging in illicit sex—it does so by focusing the court's attention on the defendant's actual conduct in the foreign nation. *See* H.R. REP. NO. 108-66, at 51 (explaining that Congress enacted § 2423(c) so "the government would only have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country."). Thus, the *locus delicti* of § 2423(c) is the place where the illicit sex occurs, and not—as is the case with § 2423(b)—where the intent to engage in the illicit conduct is formed.

Because the crux of Pendleton's offense was "committed . . . out of the jurisdiction of any . . . district," the District Court held that 18 U.S.C. § 3238 was the controlling venue provision. Section 3238 provides that an offense "begun or committed" outside the United States "shall be [prosecuted] in the district in which the offender . . . is arrested." Pendleton argues that § 3238 does not apply to him because part of his offense occurred in the Eastern District of New York and the title of § 3238 describes only those "offenses not committed in *any* district." *Id.* (emphasis added). This argument has some persuasive force, as two of our sister courts of appeals have held that "[s]ection 3238

9

does not apply unless the offense was committed entirely on the high seas or outside the United States." *United States v. Pace*, 314 F.3d 344, 351 (9th Cir. 2002); *United States v. Gilboe*, 684 F.2d 235 (2d Cir. 1982); *see also United States v. Perlitz*, 728 F. Supp. 2d 46 (D. Conn. 2010) (stating in dicta that § 3238 cannot apply, "by its terms," to a § 2423(c) offense because "an essential conduct element" of the offense, *i.e.*, foreign travel, occurs within a district of the United States).

On the other hand, the Courts of Appeals for the Fourth and Fifth Circuits have held that § 3238 applies even when some of a defendant's offense conduct takes place in the United States. *See*, *e.g.*, *United States v. Levy Auto Parts*, 787 F.2d 946, 950-952 (4th Cir.), *cert. denied*, 479 U.S. 828 (1986) (finding venue proper under § 3238 when conspiracy was "essentially foreign," even when some overt acts occurred inside the United States); *United States v. Erwin*, 602 F.2d 1183, 1185 (5th Cir. 1979), *cert. denied*, 444 U.S. 1071 (1980) ("That venue may also be appropriate in another district will not divest venue properly established under § 3238."); *see also United States v. Bin Laden*, 146 F. Supp. 2d 373, 381 n.17 (S.D.N.Y. 2001) (criticizing the Second Circuit's narrow reading of § 3238 in *Gilboe* as "myopic" and "directly in conflict with the clear language of the statute," and noting that the decision "has never been favorably cited or relied upon" by district courts in the Second Circuit).

Although the title of § 3238 includes only "offenses not committed in any district," it is a "well-settled rule of statutory interpretation that titles and section headings cannot limit the plain meaning of statutory text where that text is clear." *M.A. ex rel. E.S. v. State-Operated Sch. Dist.*, 344 F.3d 335, 348 (3d Cir. 2003). Here, the plain language of §

3238 supports the Fourth and Fifth Circuits' interpretation of the statute. Section 3238 applies, by its terms, to any offense "begun or committed" outside the United States. Pendleton would have us read the term "committed" to mean "wholly committed." But this cannot be correct, because crimes that are "wholly committed" outside the United States are, by definition, "begun" abroad. For the term "committed" to have independent meaning, it must refer to crimes that begin *inside* the United States but that are in their essence committed abroad. *See Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001) ("[W]hen interpreting a statute, courts should endeavor to give meaning to every word which Congress used and therefore should avoid an interpretation which renders an element of the language superfluous.").

Here, although Pendleton's offense began when he initiated foreign travel by boarding a plane bound for Germany in the Eastern District of New York, he "committed" the offense when he engaged in an illicit sex act in Germany. Because Pendleton's criminal conduct was "essentially foreign," *Levy Auto Parts*, 787 F.2d at 950, the District Court did not err in applying § 3238 to hold that venue was proper in the district of arrest.

## III

Having found that venue was proper in Delaware, we turn to Pendleton's substantive claim, namely, his assertion that the "noncommercial prong" of 18 U.S.C. § 2423(c) is facially unconstitutional. Pendleton's constitutional claim is subject to plenary review. *United States v. Singletary*, 268 F.3d 196, 199 (3d Cir. 2001). Because Pendleton raises a facial challenge, we will invalidate the statute only if we find "that no set of circumstances exists under which the Act

11

would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citations and internal quotation marks omitted). The Supreme Court has noted that a facial challenge is the "most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

A

The Constitution authorizes Congress "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. In the early days of the Republic, the Supreme Court defined "commerce" broadly to include "every species of commercial intercourse" between two parties. *Gibbons v. Ogden*, 22 U.S. 1, 193-94 (1824). More recently, the Supreme Court has recognized "three general categories of regulation in which Congress is authorized to engage under its commerce power." *Gonzales v. Raich*, 545 U.S. 1, 5 (2005). These include: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. *Lopez*, 514 U.S. at 558-59. In its pathmarking decision in *Lopez*, the Supreme Court held unconstitutional a statute criminalizing the possession of a firearm in a school zone because it did not fall within one of the three aforementioned categories. Five years later, in *United States v. Morrison*, the Court struck down portions of the Violence Against Women Act on similar grounds. 529 U.S. 598, 617 (2000) ("The concern . . . that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded.").

The three-category framework outlined in *Lopez* and *Morrison* applies, on its face, to statutes enacted pursuant to the Interstate Commerce Clause. The Supreme Court has yet to determine whether this framework applies to cases involving Congress's power to regulate pursuant to the Foreign Commerce Clause. Early opinions of the Court suggest that the three subparts of the Commerce Clause should be interpreted similarly. Notably, in *Gibbons v. Ogden*, Chief Justice Marshall suggested that "commerce, as the word is used in the constitution, is a unit . . . [and] it must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain intelligible cause which alters it." 22 U.S. at 194; *see also Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 329 (2000) ("refus[ing] to adopt a construction that would attribute different meanings to the same phrase in the same sentence, depending upon which object it is modifying"); Saikrishna Prakash, *Our Three Commerce Clauses and the Presumption of Intrasentence Uniformity*, 55 ARK. L. REV. 1149, 1173 (2003) ("In practice, we have three different Commerce Clauses when text and history indicate that we ought to have but one.").

Notwithstanding Chief Justice Marshall's statement in *Gibbons*, the three subclauses of Article 1, § 8, cl. 3 have acquired markedly different meanings over time. Whereas the Interstate Commerce Clause has been constrained by state sovereignty concerns, *see, e.g.*, *Morrison*, 529 U.S. at 615, the Indian Commerce Clause has been interpreted so broadly as to grant Congress "plenary and exclusive" authority to regulate nearly every aspect of Indian life. *United States v. Lara*, 541 U.S. 193, 200 (2004) (citing *United States v. Wheeler*, 435 U.S. 313, 319 (1978)); *see also Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989)

13

("While the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs.").

The Foreign Commerce Clause likewise has "followed its own distinct evolutionary path," *Clark*, 435 F.3d at 1113, having been used primarily as a tool to limit the ability of the several states to intervene in matters affecting international trade. *See, e.g.*, *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298 (1994); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979); *Antilles Cement Corp. v. Acevedo Vila*, 408 F.3d 41 (1st Cir. 2005). For example, in *Japan Line*, the Supreme Court held that California could not impose an *ad valorem* tax on Japanese shipping containers that were stored temporarily in the state because the scheme could restrict the federal government's ability to "speak with one voice" in foreign affairs. 441 U.S. at 448. Recognizing that the purpose of the Foreign Commerce Clause was to establish national uniformity over commerce with foreign nations,[4] the Court held that, "[a]lthough the Constitution,

---

[4] Indeed, this was a principal reason for assembling the Constitutional Convention of 1787. *Gibbons*, 22 U.S. at 225 (Johnson, J., concurring) (quoting the preamble of James Madison's draft resolution at the Virginia Ratifying Convention, stating that "the relative situation of the United States has been found, on trial, to require uniformity in their commercial regulations, as the only effectual policy for obtaining, in the ports of foreign nations, a stipulation of privileges reciprocal to those enjoyed by the subjects of such nations in the ports of the United States"); *see also Michelin*

14

Art. I § 8, cl. 3, grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater." *Id.*

Although jurisprudence on the so-called "dormant" Foreign Commerce Clause is well-developed, "[c]ases involving the reach of . . . congressional authority to regulate our citizens' conduct abroad are few and far between." *Clark*, 435 F.3d at 1102. Courts have consistently held that the Foreign Commerce Clause requires a jurisdictional nexus "with" the United States, *see, e.g.*, *U.S. v. Weingarten*, 632 F.3d 60 (2d Cir. 2011) (stating that a person who travels from one foreign nation to another to commit an illicit sex act may not be punished pursuant to Congress's foreign commerce power); *Cheng v. Boeing Co.*, 708 F.2d 1406, 1412 (9th Cir. 1983) ("The Federal Aviation Act does not apply to the activities of a foreign carrier operating between two foreign points without contact in the United States."), but there is precious little case law on how to establish the requisite link

---

*Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976) ("[A] compelling reason for the calling of the Constitutional Convention of 1787 . . . was the fact that the Articles [of Confederation] essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased."); *United States v. The William*, 28 F. Cas. 614, 620 (D. Mass. 1808) ("It is well understood, that the depressed state of American commerce, and complete experience of the inefficiency of state regulations, to apply a remedy, were among the great, procuring causes of the federal constitution.").

to commercial interests in the United States. In the absence of Supreme Court precedent on the issue, the Court of Appeals for the Ninth Circuit determined that the *Lopez* framework—which developed to "reconcile[] . . . the conflicting claims of state and national power"—has little analytical value in the Foreign Commerce Clause context. *Clark*, 435 F.3d at 1118. Rather than applying *Lopez*'s three-part framework to determine whether a statute has a "constitutionally tenable nexus with foreign commerce," the Ninth Circuit proposed a "global, commonsense approach," which considers "whether the statute bears a rational relationship to Congress's authority under the Foreign Commerce Clause."[5] *Id.*

---

[5] The Ninth Circuit in *Clark* claims to borrow this "rational basis" test from the Supreme Court's holding in *Gonzales v. Raich*. *See* 545 U.S. at 5 (holding that Congress had a "rational basis" for believing that intrastate possession and manufacture of marijuana had a substantial effect on interstate commerce). As the dissent in *Clark* rightly notes, however, the "rational basis" analysis in *Raich* went to Congress's "substantial effects" determination. The Supreme Court has articulated several factors to be weighed in determining whether an activity "substantially affects" interstate commerce: (1) whether the regulated activity is economic in nature; (2) whether the statute contains an "express jurisdictional element" linking its scope in some way to interstate commerce; (3) whether Congress made express findings regarding the effects of the regulated activity on interstate commerce; and (4) attenuation of the link between the regulated activity and interstate commerce. *See Morrison*, 529 U.S. at 611-12.

16

The Government urges us to adopt the Ninth Circuit's approach to the Foreign Commerce Clause. Although we agree with *Clark* that the Interstate Commerce Clause developed to address "unique federalism concerns" that are absent in the foreign commerce context, we are hesitant to dispose of *Lopez*'s "time-tested" framework without further guidance from the Supreme Court. *See id.* at 1119 (Ferguson, J., dissenting). The Supreme Court has not yet held that Congress has greater authority to regulate activity outside the United States than it does within its borders; in fact, the language used to describe its extraterritorial jurisdiction is quite similar to that used in *Lopez*. *See, e.g.*, *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 795 (1993) (recognizing that the Sherman Antitrust Act applies extraterritorially, and stating that a jurisdictional nexus exists when "foreign conduct was meant to produce and did in fact produce some substantial effect in the United States"). In any case, we need not reach the fundamental question of whether the Supreme Court will adopt the Ninth Circuit's broad articulation of the Foreign Commerce Clause because, as we shall explain, § 2423(c) is a valid congressional enactment under the narrower standard articulated in *Lopez*.

---

The "rational basis" standard articulated by the Ninth Circuit in *Clark* does not consider any of these factors. Rather, its open-ended inquiry seems to borrow more heavily from the Supreme Court's pre-*Lopez* jurisprudence, which held that a court's "investigation . . . end[s]" once it determines that "legislators . . . have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce." *Katzenbach v. McClung*, 379 U.S. 294, 303-04 (1964).

17

B

"[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964) (quoting *Caminetti v. United States*, 242 U.S. 470, 491 (1917)); *see also Morrison*, 529 U.S. at 612 (describing the Court's holding in *Lopez*, and noting that that although 18 U.S.C. § 922(g) contains "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce, . . . [s]uch a jurisdictional element [would have] establish[ed] that the enactment is in pursuance of Congress's regulation of interstate commerce") (citations and internal quotation marks omitted). Unlike Congressional authority to regulate activities affecting interstate commerce under the third category in *Lopez*, Congress's authority to regulate the *channels* of commerce is not confined to regulations with an economic purpose or impact. *See, e.g.*, *Caminetti*, 242 U.S. at 491 (criminalizing the interstate transportation of a woman or girl for prostitution); *Perez v. United States*, 402 U.S. 146, 150 (1971) (banning the interstate shipment of kidnapped persons); *United States v. Cummings*, 281 F.3d 1046, 1049-51 (9th Cir. 2002) (holding that the International Parental Kidnapping Crime Act regulates the channels of foreign commerce by prohibiting the removal or retention of a child outside the United States "with intent to obstruct the lawful exercise of parental rights").

In *United States v. Tykarsky*, we held that 18 U.S.C. § 2423(b), which criminalizes interstate travel with intent to engage in illicit sexual conduct with a minor, is a valid

18

exercise of Congress's power to regulate the channels of commerce. 446 F.3d 458, 470 (3d Cir. 2006); *accord United States v. Hawkins*, 513 F.3d 59, 61 (2d Cir. 2008) (per curiam); *United States v. Buttrick,* 432 F.3d 373, 374 (1st Cir. 2005); *Bredimus*, 352 F.3d at 205-207. Pendleton attempts to distinguish *Tykarsky* by noting that unlike § 2423(b), § 2423(c) includes no intent requirement. Citing *United States v. Rodia* for the proposition that "[t]he mere presence of a jurisdictional element . . . does not in and of itself insulate a statute from judicial scrutiny under the Commerce Clause," Pendleton claims the District Court should have inquired whether "the jurisdictional component in this case limits the statute to items that have an explicit connection with, or effect upon, [foreign] commerce." 194 F.3d 465, 472 (3d Cir. 1999) (finding that 18 U.S.C. § 2252(a)(4)(B)'s jurisdictional requirement that materials like film and cameras move in interstate commerce "is only tenuously related to the ultimate activity regulated: intrastate possession of child pornography"). No such connection exists here, Pendleton argues, because his conviction under § 2423(c) would stand even if he traveled through the channels of commerce for an entirely lawful purpose and only later formed the intent to engage in illicit sex with a minor. Contrary to Pendleton's assertions, however, a statute need not include an element of *mens rea* to trigger the first prong of *Lopez*.

In *United States v. Shenandoah*, we upheld portions of the Sex Offender Registration and Notification Act (SORNA), 18 U.S.C. § 2250(a)(1) and (2) and 42 U.S.C. § 14072(i)(1), making it illegal for a sex offender to fail to properly register after traveling in interstate commerce. 595 F.3d 151, 161 (3d Cir. 2010); *accord United States v. Ambert*, 561 F.3d 1202, 1211 (11th Cir. 2009); *United States v. May*,

19

535 F.3d 912, 921 (8th Cir. 2008).  Like the provision at issue here (§ 2423(c)), SORNA does not require that a sex offender intend, at the time of travel, to later violate federal registration requirements.  Nor does SORNA require the Government to demonstrate a temporal connection between the time of travel and a sex offender's failure to register.  *United States v. Husted*, 2007 U.S. Dist. LEXIS 56662, at *9 (W.D. Okla. June 29, 2007) (citing H.R. REP. NO. 109-218 (Sept. 7, 2005)) ("[T]he legislative history of the statute shows Congress chose not to incorporate a temporal requirement but, instead, intended to encompass all sex offenders.").  For instance, a "tier I sex offender" who moves from one state to another and, years later, violates SORNA's provisions by failing to update his information on an annual basis can be convicted under the statute.  18 U.S.C. § 2250(a)(1); *see Carr v. United States*, 130 S. Ct. 2229, 2235 (2010) (observing in dicta that "[a] sequential reading [of the statute] . . . helps to assure a nexus between a defendant's interstate travel and his failure to register as a sex offender").[6]

---

[6] In this respect, SORNA's "failure to register" provision is similar to the federal felon-in-possession law, 18 U.S.C. § 922(g), enacted pursuant to Congress's authority under the Commerce Clause.  Section 922(g) makes it unlawful for a felon to "possess in or affecting commerce, any firearm or ammunition . . . which has been shipped or transported in interstate or foreign commerce."  In *Singletary v. United States*, we held that the transport of a weapon through the channels of interstate commerce—however remote in the distant past—provides a sufficient jurisdictional nexus to satisfy *Lopez*'s first prong.  268 F.3d 196, 200 (3d Cir. 2001) (citing *Scarborough v. United States*, 341 U.S.

Nevertheless, SORNA was specifically enacted to address "one of the biggest problems in our current sex offender registry," 152 CONG. REC. S8012-14 (daily ed. July 20, 2006), 2005 WL 2034118, namely, sex offenders who go "missing" from the national registry by moving from one state to another, H.R. REP. NO. 109-218(1) (2005), 2005 WL 2210642. Finding that "over 10,000 sex offenders, or nearly one-fifth in the Nation . . . are 'missing,'" *id.*, Congress chose to regulate the behavior of *all* sex offenders who cross state lines. Because Congress invoked its authority to regulate "the use of interstate commerce to facilitate forms of immorality," *Shenandoah*, 95 F.3d at 161 (citing *Brooks v. United States*, 267 U.S. 432, 436 (1925)), it was not obliged to include an express intent or temporal element in its definition of the offense. *Accord United States v. Dixon*, 551 F.3d 578 (7th Cir. 2008) (summarily rejecting defendant's Commerce Clause argument, noting that the defendant "must in the heat of argument have forgotten the Mann Act"); *United States v. Hann*, 574 F. Supp. 2d 827, 833 (M.D. Tenn. 2008) ("[*Lopez*] encompasses § 2250(a) because the statute regulates sex offenders who travel in interstate commerce even though the threat Congress was attempting to address—failure to register as a sex offender—is an intrastate activity.") (citations omitted).

The same rationale applies to Pendleton's case. Just as SORNA's "failure to report" provision was intended to prevent convicted sex offenders from "us[ing] the channels of interstate commerce in evading a State's reach," *Carr*, 130 S.

563, 564 (1977)). Similarly, under § 2423(c), a person's travel through foreign commerce continues to provide a link to his illicit sexual conduct long after his travel is complete.

21

Ct. at 2238, Congress enacted § 2423(c) to close "significant loopholes in the law that persons who travel to foreign countries seeking sex with children are currently using to their advantage in order to avoid prosecution," H.R. REP. NO. 107-525, at 3 (summarizing the purpose of adopting language similar to § 2423(c) in the Sex Tourism Prohibition Improvement Act). Specifically, Congress found that American citizens were using the channels of foreign commerce to travel to countries where "dire poverty and . . . lax enforcement" would allow them to "escape prosecution" for their crimes of child sexual abuse. 148 CONG. REC. 3884; *id.* at 3885 ("Sadly, we know that many Americans go abroad to prey on young girls in other countries because laws protecting women are very weak, non-existent, or not enforced."); H.R. REP. NO. 107-525, at 4 ("According to the National Center for Missing and Exploited Children, child-sex tourism is a major component of the worldwide sexual exploitation of children and is increasing. There are more than 100 web sites devoted to promoting teenage commercial sex in Asia alone."); *see also* 109 H.R. 2012, 109th Cong. § 2 (2005) ("The United Nations estimates that sex trafficking, including sex tourism, generates approximately $5,000,000,000 a year in revenues. There are a number of United States-based companies that overtly and explicitly facilitate sex tours, often involving the sexual exploitation of children. According to some estimates, up to 1/4 of international sex tourists are American.").

Members of Congress also expressed concern that § 2423(b) would not adequately deter child-sex tourists because prosecutors were having an "extremely difficult" time "proving intent in such cases." 148 CONG. REC. 3884 (stating that intent is particularly "difficult to prove without direct

22

arrangement booked through obvious child sex-tour networks."). This, in turn, "creat[ed] a loophole in the law for men who go abroad to have sex with minors, which in the United States is considered statutory rape." *Id.* Section 2423(c) was enacted to close the enforcement gap and to "send a message to those who go to foreign countries to exploit children that no one can abuse a child with impunity." *Id.* Thus, as it did with SORNA, Congress enacted § 2423(c) to regulate persons who use the channels of commerce to circumvent local laws that criminalize child abuse and molestation. And just as Congress may cast a wide net to stop sex offenders from traveling in interstate commerce to evade state registration requirements, so too may it attempt to prevent sex tourists from using the channels of foreign commerce to abuse children. *Id.*; *Clark*, 435 F.3d at 1116 ("Congress legitimately exercises its authority to regulate the channels of commerce where a crime committed on foreign soil is necessarily tied to travel in foreign commerce, even where the actual use of the channels has ceased."); *N. Am. Co. v. SEC*, 327 U.S. 686, 705 (1946) ("Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature.").

In sum, because the jurisdictional element in § 2423(c) has an "express connection" to the channels of foreign commerce, *Morrison*, 529 U.S. at 612, we hold that it is a valid exercise of Congress's power under the Foreign Commerce Clause.[7]

---

[7] Having found that the statute is constitutional under the first prong of *Lopez*, we need not address Pendleton's

## IV

For the foregoing reasons, we will affirm the District Court's judgment of conviction and sentence.

---

contention that § 2423(f)(1) does not survive *Morrison*'s stringent "substantial effects" test. *See United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006) ("[W]e need not proceed to an analysis of *Lopez*'s third category when Congress clearly has the power to regulate such an activity under the first two."); *United States v. May*, 535 F.3d 912, 922 (8th Cir. 2008) (upholding SORNA under the first and second prongs of *Lopez*, and thus finding that it "need not address [the defendant's] contention SORNA was not accompanied by findings that the activity in question exerted a 'substantial influence on interstate commerce' similar to those in support of the Controlled Substances Act regulation considered and upheld in *Gonzales v. Raich*, 545 U.S. 1 (2005)").