**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2335
_____

UNITED STATES OF AMERICA

v.

CORRIGAN CLAY,
Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:22-cr-00055-001)
District Judge: Honorable Christy Criswell Wiegand
_____

Argued on June 5, 2024

Before: HARDIMAN, PORTER, and AMBRO, *Circuit
Judges*.

(Filed: February 3, 2025)

Tina Miller
Devin M. Misour [Argued]
Comber Miller

436 Seventh Avenue
300 Koppers Building
Pittsburgh, PA 15219

*Counsel for Appellant*

Nicole M. Argentieri
Lisa H. Miller
Sonja M. Ralston [Argued]
United States Department of Justice
950 Pennsylvania Avenue NW
Suite 1264
Washington, D.C. 20530

Jessica L. Urban
Alicia Bove
United States Department of Justice
1301 New York Avenue NW
Washington, D.C. 20005

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Corrigan Clay pleaded guilty to sexually abusing his minor adopted daughter while living in Haiti, in violation of 18 U.S.C. § 2423(c). In this appeal, he argues principally that Congress lacked the power to enact § 2423(c). In our view,

§ 2423(c) is a permissible exercise of congressional power under the Foreign Commerce Clause and the Necessary and Proper Clause. Because we also conclude that the District Court did not err in imposing Clay's sentence, we will affirm.

I

A

Born in Oregon, Clay was raised by a loving and supportive family. After experiencing "many years of unresolved grief and suffering" stemming from the early deaths of his older brother and father, Clay was "propelled . . . into a lifestyle of service in difficult environments." Dist. Ct. Dkt. No. 138, Sentencing Tr. ("Tr.") at 138. After graduating from college, he married his first wife and the couple moved from the United States to Germany, where they became Christian youth ministers. They had two biological children before moving first to Canada, where Clay obtained a master's degree in theology, and then to Haiti "to work in service to the poor." *Id.* While working in a Haitian orphanage, the couple became disillusioned by its abusive environment and corrupt staff, so they left to found their own nonprofit organization.

While living in Haiti, the couple adopted two Haitian children. Unfortunately, the stresses of serving the poor took "a huge toll" on Clay, causing him to "lash out at [his] children and neglect [his] marriage." *Id.*; App. 179. Around the same time, Haiti was struck by a massive earthquake, and Clay experienced "psychological trauma" as he tried to cope with the resulting devastation. App. 211. His marriage deteriorated and ended in divorce.

## B

Prior to their divorce and while still in Haiti, Clay and his wife lived separately. They shared custody of their children, who usually stayed with Clay on weekends. When the children visited him, they each had their own sleeping areas except for one of his adopted daughters. According to Clay, she usually slept next to him in the downstairs bedroom—even if she initially went to bed upstairs—because she would get scared by noises.

After his divorce was finalized, Clay began to experience intrusive thoughts, nightmares, and symptoms of post-traumatic stress disorder. He testified at sentencing that he felt "utterly alone with no affection . . . [in] the country that had meant so much to [him] but had taken everything away." Tr. at 138–139.

Clay's adopted daughter often wet the bed while sleeping with him. On one such night, Clay stripped all the bedding, and they went back to bed together with just a clean blanket and no clothing. According to Clay, this incident sparked his protracted sexual abuse of her. Clay claimed that he sexually abused her fewer than 20 times over less than 6 months. The abuse ended when Clay's ex-wife left Haiti for the United States and took the children with her. But Clay continued to travel to the United States with his second wife to visit the children as much as possible.

Following a visit with Clay in November 2020, the minor victim told her mother that Clay had previously sexually abused her. Clay's ex-wife confronted him, and he admitted that the allegation was true. Clay later confessed to state and federal law enforcement.

4

C

Clay was indicted for violating 18 U.S.C. § 2423(c), which prohibits any citizen or legal permanent resident of the United States "who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country" from "engag[ing] in any illicit sexual conduct with another person."[1] The statute elsewhere defines "illicit sexual conduct" to include "a sexual act" with a minor that would violate U.S. law had it occurred within the territorial jurisdiction of the United States. 18 U.S.C. § 2423(g)(1) ((f)(1) prior to December 22, 2023). The indictment did not allege that Clay traveled with the intent to engage in illicit sexual conduct or that his conduct affected foreign commerce. During the period covered by the indictment, Clay: (1) traveled repeatedly between Haiti and the United States, where he owned an income-producing property; (2) instituted adoption proceedings for his two Haitian children in Washington state court; (3) listed an address in the State of Washington as his permanent address when applying for U.S. passports for his adopted children; and (4) used a Florida address to obtain a Florida driver's license in September 2018.

Clay moved to dismiss the indictment under Rule 12(b)(3) of the Federal Rules of Criminal Procedure, claiming that § 2423(c) was unconstitutional on its face and as applied to him. He argued that neither Congress's power to regulate foreign commerce nor its treaty power "extend[ed] so far as to

---

[1] As Clay's counsel conceded at oral argument, Clay can prevail only if *both* the "travels in foreign commerce" and "resides in . . . a foreign country" prongs of § 2423(c) exceed the powers of Congress, since he pleaded guilty to an indictment charging both prongs. *See United States v. Park*, 938 F.3d 354, 364 (D.C. Cir. 2019).

allow Congress to regulate [his] entirely non-commercial foreign conduct." Dist. Ct. Dkt. No. 76, at 4. The District Court denied Clay's motion, concluding that § 2423(c) was a constitutional exercise of Congress's authority to regulate the channels of foreign commerce based on our decision in *United States v. Pendleton*, 658 F.3d 299 (3d Cir. 2011). The Court declined to address the parties' arguments on the treaty power.

After the District Court denied his motion to dismiss, Clay pleaded guilty without a plea agreement. In his sentencing memorandum, Clay sought a downward variance based on "both the facts of the case and the broader legal landscape governing sentencing under § 2423(c)." Dist. Ct. Dkt. No. 106, at 3. The District Court denied the variance and sentenced Clay to 235 months' imprisonment—the bottom of the Sentencing Guidelines range—reasoning that the sentence "appropriately reflect[ed] the seriousness of his offense and the needs for just punishment, deterrence[,] and rehabilitation and that it would not lead to unwarranted sentencing disparities between . . . Clay and others convicted under the same statute." Tr. at 164. Clay stated his intent to appeal the constitutional challenge he had previously raised and also objected procedurally to the sentence, "[i]n particular . . . the consideration of . . . avoiding unwarranted sentencing disparities among defendants with similar records." Tr. at 167. He then filed this timely appeal.[2]

II

We exercise plenary review over the District Court's legal conclusions, and we review its factual findings for clear

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C.

6

error. *See United States v. Stock*, 728 F.3d 287, 291 (3d Cir. 2013). Every law enacted by Congress must be based on one or more of its powers, or "from them all combined." *Legal Tender Cases*, 79 U.S. (12 Wall.) 457, 534 (1870). In other words, we may group together any number of powers and "infer from them all that the power claimed has been conferred." *Id.* And "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a *plain showing* that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000) (emphasis added).

Clay characterizes § 2423(c) as usurping the law enforcement responsibilities of the Haitian government and argues that "neither the Foreign Commerce Clause nor the Necessary and Proper Clause authorize the extraterritorial enforcement of [federal] criminal laws against [him] for noncommercial incestual conduct that occurred entirely outside the United States." Clay Br. 9.

III

The difficult constitutional questions raised in this appeal require us to explain in some detail the provenance of the statute under review. "Section 2423[(c)] developed through a century of legislation addressing international sex trafficking," originating in the White-Slave Traffic (Mann) Act, ch. 395, § 2, 36 Stat. 825 (1910) (codified as amended at

---

§ 3742(a). Clay may challenge the constitutionality of the statute of conviction because this issue "properly fall[s] within the narrow scope of review not barred by [his] guilty plea." *United States v. Whited*, 311 F.3d 259, 262 (3d Cir. 2002).

7

18 U.S.C. § 2421 *et seq.*). *United States v. Durham*, 902 F.3d 1180, 1194 (10th Cir. 2018). "For decades, [this] statute covered only situations in which the minor victim of certain sex crimes was transported across state or federal borders." *United States v. Pepe*, 895 F.3d 679, 683 (9th Cir. 2018) (citation omitted).

In 1978, Congress expanded the statute to prohibit commercial sexual abuse against boys as well as girls. *See* Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. No. 95-225, § 3, 92 Stat. 7, 8 (1978). After recognizing that the statute failed to address "private" (as opposed to commercial) exploitation, H.R. Rep. No. 99-910, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5952, 5957, Congress expanded the law in 1986 to encompass noncommercial sexual exploitation, Child Sexual Abuse and Pornography Act of 1986, Pub. L. No. 99-628, § 5, 100 Stat. 3510, 3511 (1986).

Less than a decade later, Congress began to target sex tourism. *See Durham*, 902 F.3d at 1195. In 1994, it added the offense now codified at § 2423(b) to punish individuals who traveled in foreign commerce "for the purpose of engaging in [a prohibited] sexual act." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 160001(g), 108 Stat. 1796, 2037.

Prosecutors sometimes had trouble proving the intent element of that offense. *See* H.R. Rep. No. 107-525, at 2–3 (2002). Congress addressed this enforcement gap by enacting § 2423(c) in 2003 "[a]s a tool to close statutory 'loopholes' that affected commercial sex tourism." *United States v. Bollinger*, 798 F.3d 201, 218 (4th Cir. 2015). Passed as part of the Prosecutorial Remedies and Tools Against the Exploitation of

8

Children Today (PROTECT) Act, Pub. L. No. 108-21, § 105, 117 Stat. 650, 654 (2003), "Congress viewed [§ 2423(c)] as a critical part of its broader efforts to combat the multibillion dollar international sex trafficking market." *Durham*, 902 F.3d at 1197. To that end, "§ 2423(c) targets the same individuals as does § 2423(b)—namely, persons traveling in commerce for the purpose of engaging in illicit sex—[but] it does so by focusing the court's attention on the defendant's *actual conduct* in the foreign nation." *Pendleton*, 658 F.3d at 304 (emphasis added) (citations omitted). "In sum, Congress has worked to combat sex trafficking—particularly of minors—for over a century, developing a *statutory scheme* targeting sexual exploitation for *both commercial and noncommercial purposes*." *Durham*, 902 F.3d at 1197 (emphases added).

IV

Having explained the statutory backdrop, we consider the Foreign Commerce Clause and the Necessary and Proper Clause to assess whether Congress had the power to enact § 2423(c).[3]

A

Congress has the power to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. Does that include

---

[3] At oral argument, the Government argued that Congress had the power to establish nationality-based jurisdiction under *Blackmer v. United States*, 284 U.S. 421 (1932). In that case, a U.S. citizen living in France was found guilty of contempt for failing to respond to a subpoena requiring him to appear as a witness for the United States at a criminal trial. 284 U.S. at 433.

the power to regulate the conduct of American citizens abroad? It is hard to know because such cases "are few and far between." *United States v. Clark*, 435 F.3d 1100, 1102 (9th Cir. 2006). *See also* Anthony J. Colangelo, *The Foreign Commerce Clause*, 96 Va. L. Rev. 949, 950 (2010) ("[U]nlike its Article I, Section 8 sibling, the Interstate Commerce Clause, which has been scrutinized by generations of lawyers, scholars, and judges, the Foreign Commerce Clause has received little sustained analytical attention." (footnotes omitted)). The Supreme Court has "yet to articulate the constitutional boundaries beyond which Congress may not pass in regulating the conduct of citizens abroad." *Bollinger*, 798 F.3d at 209. Meanwhile, a circuit split has emerged regarding the scope of the Foreign Commerce Clause relative to its interstate counterpart. Most circuit courts that have considered the issue have reasoned that the Constitution grants Congress greater authority to regulate foreign commerce than interstate

---

The Supreme Court held the statute to be constitutional, reasoning that

> the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power. . . . Nor can it be doubted that the United States possesses the power inherent in sovereignty to require the return to this country of a citizen, resident elsewhere, whenever the public interest requires it, and to penalize him in case of refusal.

*Id.* at 437. Because the issue was not briefed, we decline to address it.

commerce.[4] History, text, and purpose strongly support this interpretation, at least as it relates to regulating the conduct of U.S. citizens.[5]

1

As the Supreme Court has recognized, "there is evidence that the Founders intended the scope of the foreign

---

[4] *Compare Clark*, 435 F.3d at 1103 ("Instead of slavishly marching down the path of grafting the interstate commerce framework onto foreign commerce, we step back and take a global, commonsense approach to the circumstance presented here."), *and Bollinger*, 798 F.3d at 215–16 ("Instead of requiring that an activity have a substantial effect on foreign commerce, we hold that the Foreign Commerce Clause allows Congress to regulate activities that demonstrably affect such commerce."), *and Durham*, 902 F.3d at 1209 ("Because the federalism considerations underlying the [Interstate Commerce Clause] do not arise in the regulation of foreign commerce, the economic and noneconomic distinction, which otherwise discourages the aggregation of noneconomic activity, is unnecessary."), *and United States v. Bredimus*, 352 F.3d 200, 208 (5th Cir. 2003) ("[D]eference [to Congress] applies even more forcefully to cases involving foreign commerce travel."), *with United States v. Al-Maliki*, 787 F.3d 784, 793 (6th Cir. 2015) (expressing skepticism of a broader interpretation of the Foreign Commerce Clause because of concerns that it would "allow[] the federal government to intrude on the sovereignty of other nations" and "the liberty of individual citizens"). *See also Park*, 938 F.3d at 372 ("In foreign commerce, the federalism constraints that limit Congress's interstate commerce power are absent, and there is

11

commerce power to be the greater" as compared to the interstate commerce power. *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 448 (1979). "A primary driver of the Constitutional Convention of 1787 was to resolve federal powers over foreign affairs." Scott Sullivan, *The Future of the Foreign Commerce Clause*, 83 Fordham L. Rev. 1955, 1962 (2015). As the Supreme Court explained a few decades after ratification,

> [t]he oppressed and degraded state of commerce previous to the adoption of the constitution can scarcely be forgotten. It was regulated by foreign nations with a single view to their own interests; and our disunited efforts to counteract their restrictions were rendered impotent by want of combination. . . . Those who felt the injury

a greater need for the United States to speak with a single voice.").

[5] Interpreting the Foreign Commerce Clause to permit the United States to regulate extraterritorially the conduct of foreign nations or non-U.S. citizens or nationals would implicate unique foreign sovereignty concerns. *See* Naomi Harlin Goodno, *When the Commerce Clause Goes International: A Proposed Legal Framework for the Foreign Commerce Clause*, 65 Fla. L. Rev. 1139, 1207–12 (2013). But such concerns do not arise with respect to statutes like § 2423(c) that regulate the conduct only of U.S. citizens or nationals. *See United States v. Bowman*, 260 U.S. 94, 102 (1922) ("Clearly it is no offense to the dignity or right of sovereignty of Brazil [for the United States] to hold [citizens of the United States] for [a] crime against the government to which they owe allegiance.").

arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government.

*Brown v. Maryland*, 25 U.S. (12 Wheat.) 419, 445–46 (1827).

Consistent with that imperative, the records of the Constitutional Convention and the subsequent state ratifying conventions are replete with mentions of commerce in the context of "matters of purely international significance, such as, war, treaties, and the like,"[6] or discussions "purporting to

---

[6] *See, e.g.*, 1 *The Records of the Federal Convention of 1787*, at 133 (Max Farrand ed., 1911) (Roger Sherman identifying the regulation of foreign commerce, but not interstate commerce, as an "object[] of the Union"); *id.* at 413 (James Wilson: "We have unanimously agreed to establish a general government—[t]hat the powers of peace, war, treaties, coinage and regulating of *commerce*, ought to reside in that government."); 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787*, at 124 (Jonathan Elliot ed., 1836) [hereinafter *The Debates in the Several State Conventions*] (Samuel Adams: "[T]here are many parts of [the Constitution] I esteem as highly valuable, particularly the article which empowers Congress to regulate commerce, to form treaties."); *id.* at 350 (Alexander Hamilton: "The great leading objects of the federal government, in which revenue is concerned, are to maintain domestic peace, and provide for the common defence. *In these are comprehended the regulation of commerce, . . . that is, the whole system of*

deal with commerce generally . . . [but] focus[ing] exclusively on some purely international attribute, consequence, or incident."[7] Albert S. Abel, *The Commerce Clause in the Constitutional Convention and in Contemporary Comment*, 25 Minn. L. Rev. 432, 465 (1941). In contrast, there is a "paucity" of references directed solely to interstate commerce, and none "where the grant of power over commerce between the states was advanced as the basis for independent affirmative regulation by the federal government." *Id.* at 470–71. No less an authority than James Madison deemed the Foreign

---

*foreign intercourse.*" (emphasis added)); 3 *id.* at 213 (James Monroe discussing trade relationships with Great Britain, France, and Holland in response to the question of what "commerce require[s]"); 4 *id.* at 18 (William Richardson Davie: "The next head under which the general government may be considered, is the regulation of commerce. The United States should be empowered to compel foreign nations into commercial regulations that were either founded on the principles of justice or reciprocal advantages.").

[7] *See, e.g.*, 2 *The Debates in the Several State Conventions*, *supra* note 6, at 106–07 (Nathaniel Gorham responding to a question about the economic well-being of farmers and yeoman by discussing commercial treaties with Great Britain); *Pamphlets on the Constitution of the United States, Published During its Discussion by the People, 1787–1788*, at 107 (Paul Leicester Ford ed., 1888) (Melancthon Smith: "Commerce is to expand her wings, and bear our productions to all the ports in the world."); *id.* at 379 (David Ramsay: "[I]t is probable you will soon obtain such commercial treaties, as will open to your vessels the West-India islands, and give life to your expiring commerce.").

Commerce Clause "the great and essential power" and the Interstate Commerce Cause as merely "supplemental." *The Federalist* No. 42 (James Madison).

It is true that these historical sources do not expressly assert that the Foreign Commerce Clause extends extraterritorially. But their tendency to directly link the regulation of foreign commerce with inherently extraterritorial matters (*e.g.*, war and treaties) strongly suggests that the Founders envisioned—and did not disclaim—a foreign commerce power that applied extraterritorially.[8] This explains

---

[8] Judge Porter expresses a different view of the Foreign Commerce Clause's history. He relies primarily on three sources: (1) Alexander Hamilton's essay on the Jay Treaty, Alexander Hamilton, *Camillus No. XXXVI* (1796), *reprinted in* 6 *The Works of Alexander Hamilton*, at 164–71 (Henry Cabot Lodge ed., 1904); (2) Chief Justice Marshall's opinion in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824); and (3) the views expressed by Edmund Randolph, the first Attorney General of the United States and the drafter of the first iteration of the Commerce Clause, Edmund Randolph, *Opinion on the Constitutionality of the Bank* (1791), *in* 21 *The Documentary History of the First Federal Congress of the United States of America, March 4, 1789–March 3, 1791*, at 772 (Charlene Bangs Bickford et al. eds., 2017). *See* Porter Concurrence at 5–8. These sources do not bear the weight our colleague places on them.

Hamilton wrote that "[Congress] can have no obligatory action whatsoever . . . upon any person or thing within the jurisdiction of a foreign nation," Hamilton, *Camillus No. XXXVI* (1796), *reprinted in* 6 *The Works of Alexander Hamilton*, at 167. But

---

15

why the Supreme Court has implicitly concluded that the Sherman Antitrust Act, as applied to foreign companies acting in foreign countries, was a permissible exercise of congressional power under the Foreign Commerce Clause. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 795–96 (1993); *see also id.* at 813–14 (Scalia, J., dissenting) ("[T]his Court has repeatedly upheld [Congress's foreign commerce] power to make laws applicable to persons or activities *beyond our territorial boundaries* where United States interests are affected." (emphasis added) (first citing *Ford v. United States*, 273 U.S. 593, 621–23 (1927); then citing *United States v. Bowman*, 260 U.S. 94, 98–99 (1922); and then citing *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 356 (1909))).

2

The text of the Foreign Commerce Clause also "reflects the Founders' objective to provide broader authority" to Congress than under the Interstate Commerce Clause. *Durham*,

he expressed that opinion in the context of foreign trade. *See id.* at 168–69 ("Congress . . . may regulate, by law, *our own trade and that which foreigners come to carry on with us*." (emphasis added)); *id.* at 169 ("[Congress] cannot regulate *the trade* which we may go to carry on in foreign countries." (emphasis added)). Judge Porter is correct that neither Marshall nor Randolph discussed the extraterritorial application of the Foreign Commerce Clause. But neither suggested the contrary either. This is especially telling in *Ogden*, where Chief Justice Marshall observed that "[c]ommerce among the States[] cannot stop at the external boundary line of each State, but may be introduced into the interior," while declining to specify that commerce with foreign nations must stop at their borders. *Ogden*, 22 U.S. at 194.

16

902 F.3d at 1201. "Comprehensive as the word 'among' is [in the Interstate Commerce Clause], it may very properly be restricted to that commerce which concerns more States than one." *United States v. Lopez*, 514 U.S. 549, 553 (1995) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 194 (1824)). The Foreign Commerce Clause, by contrast, authorizes Congress to "regulate Commerce *with* foreign Nations." U.S. Const. art. I, § 8, cl. 3 (emphasis added). Contemporaneous definitions of "with" included: "noting the means," "in mutual dealing," and "noting connection." 2 Samuel Johnson, *Dictionary of the English Language* (1755).

These definitions of "with" do not render the Foreign Commerce Clause limitless. For example, the word "connection" "signifies that whatever conduct Congress is attempting to regulate . . . should *link* the foreign nation and the United States." Goodno, *supra* n.5, at 1203 (emphasis added). But they do suggest that Congress's power to regulate foreign commerce is more expansive than its power to regulate interstate commerce—at least with respect to "persons or activities . . . where United States interests are affected."[9] *Hartford Fire Ins. Co.*, 509 U.S. at 813–14 (Scalia, J., dissenting). Consistent with this reasoning, the Supreme Court

---

[9] Judge Porter asserts that "Congress lacks *any* power to regulate inside sovereign nations under the Foreign Commerce Clause." Porter Concurrence at 17. If he is correct about that, numerous federal criminal statutes with extraterritorial application would be unconstitutional. *See, e.g.*, 15 U.S.C. §§ 78dd-1 *et seq.* (bribing foreign government officials); 18 U.S.C. § 2332 (killing or injuring a U.S. national while abroad); 18 U.S.C. § 1956(f) (money laundering); 18 U.S.C. §§ 470–74 (counterfeiting abroad); 18 U.S.C. § 1512(a), (h) (threatening a federal witness or informant).

has repeatedly compared the Foreign Commerce Clause to the Indian Commerce Clause, which uses the same preposition ("with"), U.S. Const., art I, § 8, cl. 3, and grants Congress "plenary and exclusive" power to legislate with respect to Indian tribes, *Haaland v. Brackeen*, 599 U.S. 255, 272 (2023) (cleaned up); *see, e.g.*, *United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 194 (1876); *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904).

3

A final reason for deeming Congress to have more expansive powers under the Foreign Commerce Clause than the Interstate Commerce Clause is that the important federalism concerns applicable to the latter have no salience with the former. *See Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 59 (1933). While the interstate commerce power must not be permitted to "effectually obliterate the distinction between what is national and what is local," *Lopez*, 514 U.S. at 557, the purpose of the Foreign Commerce Clause is to equip the United States "[i]n international relations and with respect to foreign intercourse" to "act through a single government with unified and adequate national power," *Bd. of Trs.*, 289 U.S. at 59—in other words, to speak with "one voice," *Japan Line*, 441 U.S. at 451.

It is true that foreign nations, unlike the States, "have never ceded a portion of their sovereignty to the federal government" and "are unprotected from federal encroachment by political mechanisms inherent in the federal law-making process." Colangelo, *supra*, at 955. And the Framers acknowledged "the perfect equality of nations," in which no foreign nation has a right to impose a rule on another. *The Antelope*, 23 U.S. (10 Wheat.) 66, 122 (1825) (Marshall, C.J.);

18

*see* Colangelo, *supra*, at 976 (describing Chief Justice Marshall's views as "emblematic of the time").[10] But while the Constitution grants no protection to foreign nations, they may have recourse to international law to protect their sovereignty. *See Restatement (Third) of Foreign Relations Law of the United States* §§ 401–02 (1987).

\* \* \*

For the reasons stated, there is strong evidence that Congress has more expansive power under the Foreign Commerce Clause than the Interstate Commerce Clause. But because the Supreme Court has not articulated the scope of that power, we will pursue the more restrained course and again apply the "time-tested framework" outlined in *United States v.*

---

[10] Judge Porter also emphasizes the sovereignty of foreign nations to control their respective territories. *See* Porter Concurrence at 7 (first citing *The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812); and then citing *The Antelope*, 23 U.S. at 122). But it is difficult to see how Clay's prosecution under § 2423(c) infringes Haiti's sovereignty. "[T]here is no question of international law" that "[b]y virtue of the obligations of citizenship, the United States retained its authority over [Clay], and he was bound by its laws made applicable to him in a foreign country." *Blackmer*, 284 U.S. at 436–37; *see also Restatement (Third) of Foreign Relations Law* § 402 (1987) (noting that it is uncontroversial as a matter of international law that a nation may exercise jurisdiction over "the activities . . . of its nationals *outside* as well as within its territory" (emphasis added)). Nor is there any evidence in the record that Haiti sought to prosecute Clay under its criminal laws.

*Lopez*. *Pendleton*, 658 F.3d at 308 (cleaned up).[11] As we reasoned in *Pendleton*, we need not outline the precise scope of the Foreign Commerce Clause because § 2423(c) is permissible under "the narrower standard articulated in *Lopez*." *Id.*

B

Applying the *Lopez* framework to Clay's Foreign Commerce Clause challenge, § 2423(c) is constitutional only if it fits into one of the "three broad categories of activity that Congress may regulate under its commerce power": (1) channels of foreign commerce; (2) instrumentalities of foreign commerce; and (3) activities that substantially affect foreign commerce. *See Lopez*, 514 U.S. at 558–59. For the reasons below, as applied to the prohibition of Clay's noncommercial conduct, § 2423(c) constitutes a regulation of both the channels of foreign commerce and activities that substantially affect foreign commerce.

---

[11] Though the Supreme Court "has never struck down an act of Congress as exceeding its powers to regulate foreign commerce," *Clark*, 435 F.3d at 1113, it has primarily assessed the scope of the Foreign Commerce Clause in cases involving challenges to state laws (*i.e.*, the dormant Foreign Commerce Clause), *see, e.g.*, *Japan Line*, 441 U.S. at 436 (California ad valorem property tax applied to cargo containers owned by certain Japanese shipping companies); *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159 (1983) (California income tax on corporations calculated by the amount of their worldwide business located in California); *Wardair Can., Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1 (1986) (Florida statute providing for state sales tax for aviation fuel).

In rejecting Clay's challenge to § 2423(c), the District Court correctly concluded that *Pendleton* "forecloses" his "arguments regarding sex tourism and his lack of intent at the time he traveled to Haiti" because *Pendleton* "expressly addressed the facial validity" of § 2423 "insofar as [the statute] . . . criminalized *noncommercial* sex acts."[12] App. 15 (emphasis added). In *Pendleton*, the defendant sexually molested a minor six months after arriving in Germany. 658 F.3d at 301. After he was released from a German prison, Pendleton returned to the United States and was indicted under § 2423(c). *Id.* On appeal, he argued that the statute was facially unconstitutional. *Id.* at 302. Clay seizes on the distinction between facial and as-applied challenges, asserting that the District Court

> failed to account for *any* of [his] unique facts . . . , including his residency in Haiti, the fact that his illicit conduct occurred in his own home with a member of his own family, the fact

---

[12] Clay argues that § 2423(c) is unconstitutional both on its face and as applied to him. Because we rejected an identical facial challenge to § 2423(c) in *Pendleton*, we consider only Clay's as-applied challenge here. *See Reich v. D.M. Sabia Co.*, 90 F.3d 854, 858 (3d Cir. 1996) ("[A] panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel."). Clay's efforts to distinguish the facts in his case from those in *Pendleton* are pertinent only to his as-applied challenge. *See United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case.").

that the criminal conduct was untethered to any international travel, and the fact that he has no history of engaging in commercial illicit sexual conduct or child pornography.

Clay Br. 32. But *Pendleton*'s reasoning applies equally to all noncommercial sexual abuse because it relied on the "authority of Congress to keep the channels of . . . commerce free from immoral and injurious uses." 658 F.3d at 308 (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964)). *See also N. Am. Co. v. SEC*, 327 U.S. 686, 705 (1946) ("Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature.").

Citing our decision in *United States v. Shenandoah*, 595 F.3d 151, 161 (3d Cir. 2010), we analogized § 2423(c) to the Sex Offender Registration and Notification Act, which we concluded was a proper regulation of the channels of interstate commerce even though it does not require intent by the sex offender to violate federal registration requirements. *Pendleton*, 658 F.3d at 309–10. Based on this, we held that "because the jurisdictional element in § 2423(c) has an express connection to the channels of foreign commerce, . . . it is a valid exercise of Congress's power under the Foreign Commerce Clause." *Id.* at 311 (internal quotation marks and footnote omitted). This reasoning applies equally to Clay as it did to Pendleton.

Clay argues that *Pendleton* should be read more narrowly because the illegal conduct at issue there was limited to what "was either inherently commercial or involved travel

with an improper intent." Clay Br. 33. That argument misreads *Pendleton*. Pendleton was indicted for engaging in "noncommercial illicit sexual conduct" in Germany six months after traveling there from the United States, and our opinion nowhere suggests that he traveled abroad with an intent to engage in sexual crimes. *See Pendleton*, 658 F.3d at 301–02, 311.

As Clay points out, some colleagues on our sister courts disagree with our channels-of-commerce analysis of § 2423(c). Unlike the Sex Offender Registration and Notification Act,

> § 2423(c) neither punishes the act of traveling in foreign commerce, [n]or the wrongful use or impediment of use of the channels of foreign commerce. Rather, it punishes future conduct in a foreign country entirely divorced from the act of traveling except for the fact that the travel occurs at some point prior to the regulated conduct.

*Clark*, 435 F.3d at 1119 (Ferguson, J., dissenting). Consistent with that view, some judges have expressed concern that interpreting § 2423(c) as a valid exercise of Congress's power to regulate the channels of commerce would "permit Congress to subject an American to federal prosecution for *any* offense committed abroad." *Durham*, 902 F.3d at 1256 (Hartz, J., dissenting). *See also United States v. Rife*, 33 F.4th 838, 845 (6th Cir. 2022) (similar). However compelling these concerns may be in the abstract, they do not apply here because Clay's case does not involve just "any offense committed abroad."

Section 2423(c) is constitutional under the Foreign Commerce Clause if a defendant's travel in foreign commerce

"encompasses movement abroad that maintains some nexus with the United States." *United States v. Schmidt*, 845 F.3d 153, 157 (4th Cir. 2017). Clay did just that. He traveled between the United States and Haiti multiple times each year; he owned and rented out a house in the United States; he availed himself of the Washington state court system to adopt his children (including the minor victim); and he listed addresses within the United States to acquire passports for his adopted children and a driver's license for himself. Even if Clay had been a resident of Haiti as he claims,[13] he never abandoned his U.S. citizenship or residence. Based on "all relevant facts and circumstances," *id.*, it was thus permissible for Congress to criminalize Clay's conduct under § 2423(c) pursuant to its power to regulate the channels of foreign commerce—of which Clay availed himself repeatedly for years.

2

While we did not consider in *Pendleton* whether § 2423(c) also satisfied the third *Lopez* category, 658 F.3d at 311 n.7, we now hold there is a rational basis for concluding that § 2423(c) regulates "activities [that], taken in the aggregate, substantially affect [foreign] commerce," *see United States v. Kukafka*, 478 F.3d 531, 535–36 (3d Cir. 2007) (citation omitted). Clay asserts that "[t]he noncommercial sexual abuse of a family member in the privacy of one's own home . . . has no effect on the broader market for commercial illicit sexual conduct." Clay Br. 23. The Government responds that § 2423(c) represents "an essential component of

---

[13] Clay and the Government disagree on this point, *compare* Clay Br. 6, 26, *with* Gov't Br. 24, and the District Court declined to adjudicate it, *see* Tr. at 163–164.

Congress's overall scheme to combat commercial sex tourism by Americans abroad." Gov't Br. 25 (cleaned up). We agree with the Government.

Although noncommercial sexual abuse itself is not economic,[14] "[i]nternational sex tourism is a multi-billion dollar industry." *United States v. Lindsay*, 931 F.3d 852, 862 (9th Cir. 2019). *See also* Najat Maalla M'jid, *Report of the Special Rapporteur on the Sale of Children, Child Prostitution and Child Pornography*, U.N. Doc. A/HRC/22/54, at 9 (Dec. 24, 2012). "By 2002, Congress had recognized the problem of sex tourism was growing despite previous efforts to address it." *Durham*, 902 F.3d at 1210 (citing H.R. Rep. No. 107-525, at 2 (2002)). "The legislative record contains statements expressing concern that the sex tourism industry 'support[s] one of the fastest growing areas of international criminal activity.'" *Id.*

---

[14] Authoritative dictionaries support interpreting the word "economic" to require a relationship to "the production, distribution, and consumption of goods and services." *Economic*, Merriam-Webster, https://perma.cc/GWL2-4PBM. *See also Economics*, Oxford English Dictionary, https://perma.cc/8EWL-A7TY ("The branch of knowledge . . . that deals with the production, distribution, consumption, and transfer of wealth"); *Economics*, *Black's Law Dictionary* (12th ed. 2024) ("The social science dealing with the production, distribution, and consumption of goods and services"). This understanding of "economic" aligns with how the Supreme Court has distinguished between economic and non-economic activities in its Interstate Commerce Clause jurisprudence. *Compare Lopez*, 514 U.S. at 560 (possession of a gun in a local school zone), *and Morrison*, 529 U.S. at 613 (gender-motivated crimes of violence), *with Gonzalez v. Raich*, 545 U.S. 1, 25–26 (2005) (homegrown marijuana).

(quoting 149 Cong. Rec. H2405 (2003) (statement of Rep. Sensenbrenner)).

As Congress recognized before enacting § 2423(c), "[m]any developing countries have fallen prey to the serious problem of international sex tourism," but "sex tourists often escape prosecution in [their] host countries" "for reasons ranging from ineffective law enforcement, lack of resources, corruption, and generally immature legal systems." H.R. Rep. No. 107-525, at 2–3 (2002). "The pathway to the enactment of § 2423(c) [thus] manifests a purpose to address the foreign commerce problem of the international sex trade."[15] *Durham*, 902 F.3d at 1211. More specifically, § 2423(c) was passed "to fill the enforcement gap created by § 2423(b)'s intent requirement." *Id.* at 1196.

> Criminalizing non-commercial sexual abuse is . . . conducive to eliminating commercial child exploitation given the enforcement difficulties posed by a requirement to prove a *quid-pro-quo* transaction. Proof of the commercial aspect of child sexual exploitation can be exceptionally elusive. International child sex tourists often use

---

[15] Clay suggests that the lack of specific congressional findings on the effect of noncommercial sexual abuse on foreign commerce precludes a finding that § 2423(c) regulates activities that substantially affect commerce in the aggregate. But "[w]hile congressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme, particularly when the connection to commerce is not self-evident, . . . the absence of particularized findings does not call into question Congress'[s] authority to legislate." *Raich*, 545 U.S. at 21.

travel agencies, transport, accommodation[,] and other tourism-related services that facilitate contact with children, and everyone involved has strong incentives to disguise their unlawful activities. . . . The transactional component of such inducements is systematically denied by and hidden from the child, the child's family, and the community, which makes it challenging for law enforcement to uncover. *Given the nature of commercial child sexual exploitation, Congress had a rational basis to conclude that a law requiring proof of commercial activity would result in dramatic underenforcement.*

*United States v. Park*, 938 F.3d 354, 373–74 (D.C. Cir. 2019) (emphasis added) (cleaned up).

Clay argues that his case "falls . . . squarely [within] the confines of *Lopez* and *Morrison* in the sense that [there is] a regulation over conduct as opposed to a regulation over the use of a fungible item." Oral Arg. Tr. at 50. *Morrison*, after all, explains that there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." 529 U.S. at 618. Be that as it may, *Gonzalez v. Raich*, 545 U.S. 1 (2005), is the closer analogue to Clay's case.

In *Raich*, two California residents sought to "prohibit[] the enforcement of the federal Controlled Substances Act" "to the extent it prevent[ed] them from possessing, obtaining, or manufacturing cannabis for their personal medical use." *Id.* at 7. The Supreme Court denied their request, reasoning that Congress is not "required . . . to legislate with scientific

27

exactitude. When Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class." *Id.* at 17 (cleaned up). *See also Perez v. United States*, 402 U.S. 146, 154 (1971) ("[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so." (quoting *Westfall v. United States*, 274 U.S. 256, 259 (1927))). In light of the "enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere," the Court "conclud[ed] that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a *gaping hole* in the [Controlled Substances Act]." *Raich*, 545 U.S. at 22 (emphasis added).

Raich is thus distinguishable from *Lopez*, which involved a "brief, single-subject statute" that did not comprise "an essential part of a larger regulation of economic activity." *Id.* at 23–24 (cleaned up). Tellingly, the majority in *Lopez* suggested that the result might have differed had the statute at issue been "an essential part of a larger regulation of economic activity, in which the regulatory scheme could [have] be[en] undercut unless the intrastate activity were regulated." 514 U.S. at 561. Similarly, *Morrison* involved "a federal civil remedy for the victims of gender-motivated crimes of violence," which, unlike the statute in *Raich*, did not purport to "regulate economic activity" or any kind of market. *Raich*, 545 U.S. at 25.

Just as the statutory prohibition on homegrown marijuana addressed in *Raich* formed part of a larger regulatory scheme to regulate the illicit drug market, § 2423(c) is a key component of a comprehensive framework to combat the international sex tourism market. *See Durham*, 902 F.3d at

28

1214. So Congress had a rational basis to conclude that the intent requirement in § 2423(b) was "undercutting sex tourism prosecutions" and that "shedding the mens rea requirement" would enable the prosecution of individuals who would otherwise "continue to fuel the international sex tourism market." *Id.* at 1212 n.19. The petitioners in *Lopez* and *Morrison* both proffered attenuated, but-for causal chains in which the prohibited activities of gun ownership near schools and domestic violence purportedly produced effects on interstate commerce far downstream.[16] Unlike those attenuated causal chains, § 2423(c) is, like the statutory provision in

---

[16] *See* Brief for Petitioner at 9, *Lopez*, 514 U.S. 549 (No. 93-1260), 1994 WL 242541, at *9 ("Through the mechanism of insurance, the economic consequences of violent crime are spread throughout the nation. In addition, violent crime affects interstate commerce by reducing the willingness of other individuals to travel to areas that are perceived to be unsafe. . . . Congress [also] had ample basis for concluding that the presence of guns in schools poses an unacceptable threat to the proper functioning of primary and secondary education. Congress had ample basis as well to conclude that disruption of the educational process would have substantial deleterious effects on the national economy."); Brief for Petitioner at 20, *Morrison*, 529 U.S. 598 (Nos. 99-5, 99-29), 1999 WL 1037259, at *20 ("Congress rationally determined that gender-motivated violence imposes a substantial burden on interstate commerce, impeding its victims' efforts to work, travel, and engage in other economic activity. Section 13981 is specifically designed to address the economic consequences of gender[-]motivated violence by providing victims a means of recovering their lost earnings, medical expenses, and other pecuniary and non-pecuniary losses.").

*Raich*, an essential part of a broader scheme to *directly regulate a commercial market.*[17] *See Raich*, 545 U.S. at 38–39 (Scalia, J., concurring) ("*Lopez* and *Morrison* . . . do not declare noneconomic intrastate activities to be categorically beyond the reach of the Federal Government. Neither case involved the power of Congress to exert control over intrastate activities in connection with a more comprehensive scheme of regulation.").

Clay responds that *Raich* is inapposite because it involved fungible goods. But neither the holding nor the reasoning in *Raich* is limited to illegal goods, and the same economic principles apply to a market for illegal services. So we hold that § 2423(c) is also permissible under Congress's

---

[17] The Government and our sister courts have suggested additional ways in which noncommercial child sexual abuse can affect the commercial market. *See Park*, 938 F.3d at 373 ("[N]on-commercial sexual abuse of minors can drive commercial demand for sex with minors by reinforcing the idea that such conduct is acceptable, or by allowing traffickers to use non-commercial arrangements to entice patrons into engaging in subsequent commercial behavior."); *Bollinger*, 798 F.3d at 219 ("[N]on-commercial sex with minors . . . could affect the price for child prostitution services and other market conditions in the child prostitution industry." (citation omitted)); Gov't Br. 25 ("Child sexual abuse victims are . . . far more likely to be victims of commercial sexual exploitation, cementing the interconnectedness of the two violations." (cleaned up)). We are not so sure because *Lopez* cautions against "pil[ing] inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." 514 U.S. at 567.

power to regulate activities that substantially affect commerce.

V

The Necessary and Proper Clause, as implementing the treaty power, provides an independent basis for Congress's power to enact § 2423(c). U.S. Const. art. I, § 8, cl. 18. The Constitution grants the President the power to make treaties with foreign nations, which become part of "the supreme Law of the Land" when at least two-thirds of the Senate consents. U.S. Const. art. II, § 2, cl. 2; *id.* art. VI, cl. 2.

As the Supreme Court made clear in *Missouri v. Holland*, treaties may regulate purely intrastate—and, analogously, foreign intranational—conduct. *See* 252 U.S. 416, 431–32, 435 (1920) (upholding the Migratory Bird Treaty Act, which prohibited the killing, capturing, or selling of migratory birds, including within an individual State). The Court further held in *Holland* that "[i]f [a] treaty is valid there can be no dispute about the validity of [a] statute under Article [I], Section 8, as a necessary and proper means to execute the powers of the Government."[18] *Id.* at 432. Clay attempts to characterize this language as dicta, but we are unconvinced. We have defined dicta "as a statement in a judicial opinion that

_____

[18] In *Bond v. United States*, 572 U.S. 844 (2014), the Supreme Court "interpreted a criminal statute narrowly to avoid reconsidering" this language in *Holland*, but "[t]hree Justices would have reached the constitutional question and struck down the statute as exceeding Congress's authority." *Pepe*, 895 F.3d at 690 n.6; *see Bond*, 572 U.S. at 878–79, 882 (Scalia, J., concurring); *id.* at 894–96 (Thomas, J., concurring); *id.* at 897 (Alito, J. concurring). But *Holland* remains good law, and to determine otherwise would be to overread *Bond*.

could have been deleted without seriously impairing the analytical foundations of the holding." *In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000) (cleaned up). And this language constitutes the main, if not the only, analysis justifying the constitutionality of the statute at issue in *Holland*. So it is not dicta.

"[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is *rationally related* to the implementation of a constitutionally enumerated power." *United States v. Comstock*, 560 U.S. 126, 134 (2010) (emphasis added). The Supreme Court "long ago rejected the view that the Necessary and Proper Clause demands that an Act of Congress be absolutely necessary to the exercise of an enumerated power." *Jinks v. Richland Cnty.*, 538 U.S. 456, 462 (2003) (cleaned up). Rather, a statute falls within the Clause's ambit if it is "convenient, or useful or conducive to the authority's beneficial exercise." *Comstock*, 560 U.S. at 133–34 (cleaned up). *See also Sabri v. United States*, 541 U.S. 600, 607 (2004) (reasoning that the Necessary and Proper Clause empowers Congress to "fill[] . . . regulatory gaps"). That means a treaty-implementing statute need not be identical to the treaty, *see, e.g.*, *United States v. Belfast*, 611 F.3d 783, 806–08 (11th Cir. 2010), and "Congress's power to give [a] treaty practical effect . . . is not confined to [its] minimum requirements," *Park*, 938 F.3d at 369.

As Clay notes, "[t]he legislative history of the PROTECT Act does not include a statement regarding the source of Congress's authority to enact § 2423(c)." *Pendleton*, 658 F.3d at 302 n.1; *see* Clay Br. 36–37, 39 (attempting to distinguish § 2423(c) from the Migratory Birds Treaty Act in

*Holland*). But that omission is immaterial because "[t]he question of the constitutionality of [an] action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 570 (2012) (cleaned up). "A court must be able to discern a basis for Congress's exercise of an enumerated power, but that does not mean that a 'law must be struck down because Congress used the wrong labels' or failed to identify the source of its power." *Park*, 938 F.3d at 363 (quoting *Nat'l Fed. of Indep. Bus.*, 567 U.S. at 569).

The Optional Protocol to the United Nations Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography (May 25, 2000), 2171 U.N.T.S. 227 [hereinafter Optional Protocol], seeks to eliminate commercial child sexual exploitation. Ratified by the Senate in 2002, *see* 148 Cong. Rec. S5717 (daily ed. June 18, 2002), the Optional Protocol binds 178 nations, including the United States, *see Status of Ratification Interactive Dashboard*, U.N. Hum. Off. of the High Comm'r for Hum. Rts., available at https://perma.cc/8EWL-A7TY. The Optional Protocol expressed the need for a "holistic approach" "addressing the contributing factors, including . . . irresponsible adult sexual behaviour," to facilitate the elimination of "the widespread and continuing practice of sex tourism, to which children are especially vulnerable." Optional Protocol, pmbl. At "a minimum," state parties to the Optional Protocol must criminalize "[o]ffering, delivering[,] or accepting, by whatever means, a child for the purpose of . . . [s]exual exploitation," "whether such offences are committed domestically or transnationally or on an individual or organized basis." *Id.* art. 3(1). Parties to the Optional Protocol are also permitted to "take such measures as may be

33

necessary to establish . . . jurisdiction over [these] offences" "[w]hen the alleged offender is a national of that State." *Id.* art. 4(2).

While "the Protocol does not itself specifically address non-commercial child sexual abuse," *Park*, 938 F.3d at 368, § 2423(c) is rationally related to implementing the purpose of the Optional Protocol: combatting commercial child sex tourism. Perhaps most importantly, it helps "clos[e] enforcement gaps that otherwise could . . . hinder[] the objectives of the Optional Protocol." *Id.* Relatedly, any loophole in domestic law "could encourage American sex tourists—who by some estimates comprise one quarter of all sex tourists globally—to go abroad seeking *non*-commercial sex with minors that, had it occurred in the United States, would be criminalized as statutory rape." *Id. See also Lindsay*, 931 F.3d at 863 (similar).

"[T]he Constitution does not envision or condone a vacuum of all police power, state and federal, within which citizens may commit acts abroad that would clearly be crimes if committed at home." *Bollinger*, 798 F.3d at 219. This is especially true where, as here, this vacuum would "create[] or exacerbate[] identified risks to treaty partners" in the Optional Protocol. *Park*, 938 F.3d at 369. Allowing such a vacuum "could undoubtedly have broad ramifications on our standing in the world." *Bollinger*, 798 F.3d at 219. Additionally, § 2423(c) may reduce the ability of traffickers to use noncommercial arrangements to entice children into engaging in subsequent commercial sex acts, or decrease the overall number of child sexual abuse victims—and thus the number of

victims of *commercial* sexual exploitation.[19] *See Bollinger*, 798 F.3d at 219. *See also* Jay G. Silverman et al., *The Relationship Between Commercial Sexual Exploitation of Children (CSEC) and Childhood Sexual Abuse (CSA) Among Boys and Girls in Haiti*, 29 Int'l J. of Inj. Control & Safety Promotion 86 (2022). For these reasons, we conclude that § 2423(c) is rationally related to implementing the goals of the Optional Protocol.

Our opinion should not be read to support a Necessary and Proper Clause that imposes no limits on the treaty power. At least four constraints exist. First, a statute authorized as a necessary and proper exercise of the treaty power remains subject to the Due Process Clause and other protections enshrined in the Bill of Rights. *See Asakura v. City of Seattle*, 265 U.S. 332, 341 (1924); *Boos v. Barry*, 485 U.S. 312, 324 (1988). Second, Congress "may not . . . point to *any* tangentially related treaty to defend a constitutionally suspect statute." *Park*, 938 F.3d at 369 (emphasis added). That presents no problem here because the Optional Protocol is especially related to § 2423(c) insofar as it expressly contemplates statutes that "may be necessary to establish . . . jurisdiction" over nationals who commit commercial sex offenses—which § 2423(c) does through both its "travels in foreign commerce" and "resides . . . in a foreign country" prongs. Optional Protocol, art. 4(2). Third, "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). Finally, practical

---

[19] Under the Interstate Commerce Clause framework, these chains of causation rely on too many inferences, *see Lopez*, 514 U.S. at 567, but the rational basis standard of the Necessary and Proper Clause is not limited by that principle.

political considerations, both domestic and international, prevent overreach by Congress. *See* Oona A. Hathaway, *Treaties' End: The Past, Present, and Future of International Lawmaking in the United States*, 117 Yale L.J. 1236, 1249–50 (2008). None of these limitations cuts against our conclusion that § 2423(c) is "plainly necessary and proper to implement the goals of the Optional Protocol." *Park*, 938 F.3d at 370.

VI

We turn finally to Clay's sentencing challenges. He argues that the District Court committed procedural error because it "almost entirely ignored the far-shorter sentences—imposed for objectively worse conduct—that [he] highlighted in his sentencing memorandum, as well as the other factors he identified in support of his request for a downward variance." Clay Br. 40. He also briefly contends that his sentence is substantively unreasonable. Both arguments are unpersuasive.

A sentence is procedurally reasonable if the District Court: "(1) correctly calculated the . . . advisory Guidelines range; (2) appropriately considered any motions for a departure under the Guidelines; and (3) gave meaningful consideration to the sentencing factors set forth in 18 U.S.C. § 3553(a)." *United States v. Freeman*, 763 F.3d 322, 335 (3d Cir. 2014). We consider whether the District Court "produce[d] a record sufficient to demonstrate its rational and meaningful consideration of the § 3553(a) factors." *United States v. Begin*, 696 F.3d 405, 411 (3d Cir. 2012). While the District Court was required to "acknowledge and respond to any properly presented sentencing argument which ha[d] colorable legal merit and a factual basis," *United States v. Ausburn*, 502 F.3d 313, 329 (3d Cir. 2007), it did not need to discuss meritless arguments, *United States v. Lychock*, 578 F.3d 214, 219 (3d

36

Cir. 2009). And § 3553(a) does not "insist[] upon a full opinion in every case." *Rita v. United States*, 551 U.S. 338, 356 (2007).

Under 18 U.S.C. § 3553(a)(6), a sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So this factor is relevant only if Clay identifies other defendants whose circumstances mirrored his own. *United States v. Lacerda*, 958 F.3d 196, 215 (3d Cir. 2020). He has failed to do so. All but one of his putative comparators who received lower sentences than Clay had plea agreements with appellate waivers or other consideration given, or pleaded guilty while simultaneously withdrawing motions to dismiss. Clay did not. The remaining defendant sexually abused the victim for a "short time frame" of "approximately two weeks." Sentencing Tr. at 86, *United States v. Maurizio*, No. 3:14-cr-00023-001 (W.D. Pa. Mar. 8, 2016), ECF No. 249. In contrast, Clay committed sexual abuse "numerous times" over the course of nearly six months. App. 206. In any case, the District Court meaningfully considered Clay's argument. *See id.* ("Any speculation about what might have happened had he been charged in some other jurisdiction . . . does not in the Court's view create a sentencing disparity let alone an unwarranted sentencing disparity.").

The District Court also adequately addressed Clay's arguments for a downward variance. It reasoned that: (1) Clay's acceptance of responsibility was already accounted for by a reduction in his offense level; (2) the challenges in Clay's personal life, though significant, did not mitigate his sexual abuse of the child; (3) the severity of his conduct justified the sentence whether his risk of recidivism was high or low; and (4) his support network of friends and family might be unable to detect or deter future offenses. It also reviewed the

victim impact statement in which the victim's mother requested only that Clay not be sentenced to 30 years' imprisonment (which he was not). The District Court thus sufficiently justified its decision to deny Clay's request for a downward variance.

Finally, we reject Clay's challenge to his sentence as substantively unreasonable. He can succeed only if "no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons" provided by the District Court. *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc). Because Clay's sentence was within the Guidelines range, it is presumptively reasonable, *see United States v. Pawlowski*, 27 F.4th 897, 912 (3d Cir. 2022), and Clay presents no persuasive argument to overcome this presumption. So the District Court did not abuse its discretion. *See Tomko*, 562 F.3d at 567.

\*     \*     \*

The question of whether Congress had the power to enact § 2423(c) is of grave significance. Sadly, many Americans traveling abroad have sexually abused children. Today we hold that Congress's attempt to ensure that those criminal acts do not find a safe harbor when they occur outside the United States constitutes a proper exercise of Congress's authority under the Foreign Commerce Clause and the Necessary and Proper Clause, as implementing the treaty power. In our view, each power alone is sufficient. And together they provide ample reason to reject Clay's challenge to the constitutionality of § 2423(c). We will thus affirm Clay's judgment of conviction and sentence.

PORTER, *Circuit Judge*, concurring.

I agree with the majority that *United States v. Pendleton*, 658 F.3d 299 (3d Cir. 2011), forecloses Clay's facial and as-applied challenges to 18 U.S.C. § 2423(c) and (f)(1)[1] under the Foreign Commerce Clause. And I agree that, under *Missouri v. Holland*, 252 U.S. 416 (1920), § 2423(c) was a valid exercise of Congress's power under the Necessary and Proper Clause.

I write separately because, respectfully, those precedents are flawed. First, *Pendleton* wrongly adopted the Supreme Court's framework for the Interstate Commerce Clause—articulated in *United States v. Lopez*, 514 U.S. 549 (1995)—as a floor to Congress's power under the Foreign Commerce Clause. And after adopting that framework, *Pendleton* misapplied it. The majority's attempt to buttress *Pendleton*'s holding compounds that opinion's errors. Were we writing on a clean slate, I would join the Sixth Circuit and several other judges in holding that § 2423(c) exceeds Congress's power under the Foreign Commerce Clause. *See, e.g.*, *United States v. Rife*, 33 F.4th 838, 845 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 356 (2022); *United States v. Durham*, 902 F.3d 1180, 1241 (10th Cir. 2018) (Hartz, J., dissenting); *United States v. Clark*, 435 F.3d 1100, 1117 (9th Cir. 2006) (Ferguson, J., dissenting); *United States v. Bianchi*, 386 F. App'x 156, 163 (3d Cir. 2010) (not precedential) (Roth, J., concurring in part and dissenting in part).

Second, *Holland* undermined the Constitution's structure of enumerated and limited legislative powers,

---

[1] I will refer to 18 U.S.C. § 2423(c) and (f)(1) together as "§ 2423(c)."

requiring us to enforce laws like § 2423(c) that are not valid under any enumerated power. Although the majority properly applies *Holland* here, I join my colleague and other judges who have urged the Supreme Court to clarify the scope of that case. *See, e.g.*, *United States v. Bond*, 681 F.3d 149, 170 (3d Cir. 2012) (Ambro, J., concurring) (urging the Supreme Court to "clarify" and "curtail" *Holland*), *rev'd*, 572 U.S. 844, 855 (2014) (invoking the constitutional-avoidance canon and declining to address *Holland*); *Rife*, 33 F.4th at 848 (discussing *Holland*'s errors); *United States v. Park*, 938 F.3d 354, 375 (D.C. Cir. 2019) (Griffith, J., concurring) (applying *Holland* but observing that it "has come in for some criticism").

## I.  *Pendleton* and the Foreign Commerce Clause

The Constitution authorizes Congress "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. These are referred to as the Foreign, Interstate, and Indian Commerce Clauses. *Haaland v. Brackeen*, 599 U.S. 255, 320 (2023) (Gorsuch, J., concurring). Unlike the Interstate and Indian Commerce Clauses, "th[e] [Supreme] Court has never thoroughly explored the scope of the Foreign Commerce Clause." *Baston v. United States*, 580 U.S. 1182, 1184 (2017) (Thomas, J., dissenting from denial of certiorari) (internal quotation marks and quoted source omitted). So the courts of appeals have devised their own frameworks for implementing that clause. *Id.* Prior to Clay's case, *Pendleton* was our only precedential opinion interpreting the scope of the Foreign Commerce Clause.

In *Pendleton*, given "the absence of Supreme Court precedent on the [Foreign Commerce Clause]," we grappled with whether *Lopez* governs the Foreign Commerce Clause.

658 F.3d at 307. *Lopez* held that Congress may enact a law under the Interstate Commerce Clause if it relates to (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce," or (3) "activities having a substantial relation to interstate commerce." 514 U.S. at 558–59. Like the majority of our sister circuits, we "agree[d]" that the Foreign Commerce Clause is broader than the Interstate Commerce Clause because the former is not constrained by "unique federalism concerns." *Pendleton*, 658 F.3d at 308 (internal quotation marks and quoted source omitted); *see United States v. Bollinger*, 798 F.3d 201, 210, 215–16 (4th Cir. 2015) (holding that the Foreign Commerce Clause's implementing framework must be broader than *Lopez*); *United States v. Lindsay*, 931 F.3d 852, 861–62 (9th Cir. 2019) (same); *Park*, 938 F.3d at 374 (same); *Durham*, 902 F.3d at 1209–10 (same); *but see Rife*, 33 F.4th at 844 (holding that *Lopez* is ill-suited for implementing the Foreign Commerce Clause). But we chose to analyze Pendleton's constitutional challenge under *Lopez*'s "time-tested framework," assuming that it must at the very least constitute the floor to the Foreign Commerce Clause. *Pendleton*, 658 F.3d at 308 (internal quotation marks and quoted source omitted).

We then concluded that § 2423(c) is facially valid under *Lopez*'s channels-of-commerce prong. *Id.* at 311. Section 2423(c) criminalizes, in part, U.S. citizens and permanent residents from traveling abroad and engaging in non-commercial sexual conduct with minors, including when the individual had no intent to commit a crime at the time he traveled. *Bollinger*, 798 F.3d at 218 ("Section 2423(c) removed Section 2423(b)'s condition that an individual could only be prosecuted if he/she traveled in foreign commerce '*for the*

3

*purpose of* engaging in any illicit sexual conduct.'" (quoting 18 U.S.C. § 2423(b))). We held that § 2423(c)'s "jurisdictional element"—its requirement that an individual traveled at some point in foreign commerce—is sufficient to establish an "express connection to the channels of foreign commerce." *Pendleton*, 658 F.3d at 311 (internal quotation marks and quoted source omitted). We analogized § 2423(c) to the Sex Offender Registration and Notification Act ("SORNA"),[2] which criminalizes the failure to register as a sex offender after traveling in interstate commerce. *Id.* at 309. Because SORNA is constitutional under *Lopez*, we reasoned that § 2423(c) must be constitutional as well. *Id.* at 310 (referring to *United States v. Shenandoah*, 595 F.3d 151, 160–61 (3d Cir. 2010), *abrogated on other grounds by Reynolds v. United States*, 565 U.S. 432 (2012)).

As we must, the majority applies *Pendleton* here, correctly reasoning that it forecloses Clay's facial and as-applied challenges to § 2423(c). But that case was wrongly decided, and I am unconvinced by the majority's attempt to defend it. First, *Lopez* is a misfit for the Foreign Commerce Clause when Congress purports to regulate extraterritorially. And second, assuming *Lopez* applies, § 2423(c) does not satisfy *Lopez*'s channels-of-commerce prong. While § 2423(c) may satisfy *Lopez*'s substantial-relation prong, I would not use that prong to implement the Foreign Commerce Clause.

---

[2] *See* 18 U.S.C. § 2250.

A. *Lopez* Does Not Constitute the Floor to the Foreign-Commerce Power in Cases Involving Extraterritorial Regulation.

I agree that Congress possesses greater power to regulate *domestically* under the Foreign Commerce Clause than it does under the Interstate Commerce Clause. But it does not follow that the Foreign Commerce Clause confers greater authority on Congress to regulate *extraterritorially* than the Interstate Commerce Clause confers on Congress to regulate domestically. Both *Pendleton* and the majority fail to grapple with the latter proposition, which is critical because § 2423(c) purports to regulate only extraterritorially. The Foreign Commerce Clause's history, text, and purpose demonstrate that the Foreign Commerce Clause as applied extraterritorially is narrower than the Interstate Commerce Clause as applied domestically.

1

The historical record is replete with information regarding the original understanding of the Foreign Commerce Clause's domestic application. But few sources shed light on the Clause's extraterritorial reach. Three sources prove most illuminating.

The first is Alexander Hamilton's essay on the Jay Treaty,[3] in which he expressly compared the Foreign

---

[3] The Jay Treaty established free trade and resolved land disputes between the United States and Great Britain approximately a decade after the American War of Independence. *See* Dan Lewerenz, *Historical Context and the Survival of the Jay Treaty Free Passage Right: A Response to*

5

Commerce Clause's extraterritorial reach to the President's "power of treaty." Alexander Hamilton, *Camillus No. XXXVI* (1796), *in* VI The Works of Alexander Hamilton, at 164–71 (Henry Cabot Lodge ed., 1904). There, he explained that Congress's foreign-commerce power inside the several states is broad. *Id.* at 168–69 ("Congress . . . may regulate, by law, our own trade and that which foreigners come to carry on with us[.]"). But the same is not true with respect to Congress's foreign-commerce power inside sovereign nations: "[Congress] cannot regulate the trade which we may go to carry on *in foreign* countries." *Id.* at 169 (emphasis in original). Stated more sharply, under the Foreign Commerce Clause, "[Congress] can have no obligatory action whatsoever . . . upon *any person or thing within the jurisdiction of a foreign nation*"—for example, an American citizen inside a sovereign nation. *Id.* at 167 (emphasis added). That is because Congress's legislative power inside those sovereign nations must depend on the "will or regulations of those countries." *Id.* at 169. The exception to the federal government's lack of power abroad, he continued, is the President's "power of treaty," where the United States and a sovereign nation may "mutual[ly] regulat[e]" trade between one another, which is "binding upon . . . [each country's] respective citizens." *Id.* at 168, 170.

Hamilton's understanding of the Foreign Commerce Clause foreshadowed the Supreme Court's landmark opinion in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824). In *Gibbons*, Chief Justice Marshall, echoing Hamilton, explained that, with respect to domestic regulation, the Foreign Commerce Clause is broader than the Interstate Commerce Clause. While

*Marcia Yablon-Zug*, 27 Ariz. J. Int'l & Comp. L. 193, 200–01 (2010).

Congress may not regulate "the exclusively internal commerce of a State" under its interstate-commerce power, Congress may regulate foreign commerce inside the several states "whenever the subject exists." *Id.* at 195. Tellingly, however, Chief Justice Marshall did not say that Congress's foreign-commerce power extends into sovereign nations. That is consistent with his understanding that Congress lacks such power. *See, e.g.*, *The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.) ("[A sovereign nation has] full and complete power . . . within its own territories," which may not be yielded absent "the consent of the nation itself."); *The Antelope*, 23 U.S. (10 Wheat.) 66, 122 (1825) (Marshall, C.J.) ("No principle of general law is more universally acknowledged, than the perfect equality of nations. . . . Each [sovereign nation must] legislate[] for itself, but its legislation can operate on itself alone.").

Edmund Randolph—who "drafted the initial version of the commerce clause"—likewise understood the foreign-commerce power to apply only domestically. Christopher R. Green, *Tribes, Nations, States: Our Three Commerce Powers*, 127 Penn St. L. Rev. 643, 655 (2023). During the debates on the constitutionality of the First Bank of the United States, and while serving as the first Attorney General of the United States, Randolph explained that the "heads of the power to regulate commerce with foreign nations" includes four powers:

1. [The power] to prohibit them [foreign nations] or their commodities from our ports[;]
2. [The power] to impose duties on them where none existed before, or to increase existing Duties on them[;]
3. [The power] to subject them to any species of Custom house regulations[;] [and]

> 4. [The power] to grant them any exemptions or privileges which policy may suggest.

Edmund Randolph, *Opinion on the Constitutionality of the Bank* (1791), *in* 21 The Documentary History of the First Federal Congress of the United States of America 1789–1791*, at 772 (Charlene Bangs Bickford ed., 2017). Nowhere did Randolph mention that the Foreign Commerce Clause may apply extraterritorially.

I find no evidence that the Founders understood Congress's foreign-commerce power inside sovereign nations to be greater than Congress's interstate-commerce power inside the several states, or to exist at all. They plainly understood the Foreign Commerce Clause to be greater than the Interstate Commerce Clause only with respect to Congress's power inside, and *vis a vis*,[4] the several states. They did not state or imply that Congress has the power to "project[] U.S. law into the sovereign territories of other nations under the Foreign Commerce Clause." Anthony J. Colangelo, *The Foreign Commerce Clause*, 96 Va. L. Rev. 949, 977 (2010).

The majority cites founding-era sources mentioning the Foreign Commerce Clause, but none asserts Congress's foreign-commerce power inside sovereign nations. In

---

[4] "When it is said that Congress shall have power to regulate commerce with foreign nations, this has reference to the distribution of the general legislative power of regulating our external trade, as far as it can be done by law, which is vested in Congress, from that of regulating the trade of a State within itself, which is left to each State." Hamilton, *supra*, at 169–70.

particular, the majority cites records from the Constitutional Convention and certain state conventions, where some Founders occasionally mentioned the Foreign Commerce Clause. And it repeats an oft-quoted line in *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979), that "the Founders intended the scope of the foreign commerce power to be the greater" as compared to the interstate-commerce power. Maj. Op. at 11–16. But each source[5] speaks only to either (1) Congress's power over the states to exclusively regulate foreign commerce—what is now referred to as the "dormant Foreign Commerce Clause,"[6] *see* Colangelo, *supra*,

---

[5] Many sources have nothing whatsoever to do with Congress's foreign-commerce power. *See, e.g.*, 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787*, at 124 (Johnathan Elliot ed., 1836) [hereinafter *The Debates in the Several State Conventions*] (Samuel Adams's comment that the *entire* Commerce Clause is "highly valuable"); *id.* at 106–07 (Nathaniel Gorham's comment that, via treaties, the United States should improve the economic wellbeing of farmers and landholders); *Pamphlets on the Constitution of the United States, Published During its Discussion by the People, 1787–1788*, at 107 (Paul Leicester Ford ed., 1888) (Melancthon Smith's comment that the United States's economic output should expand globally); *id.* at 379 (David Ramsay's comment that, via treaties, the United States's economic output should expand globally).

[6] *See, e.g.*, 1 *Records of the Federal Convention of 1787*, at 133 (Max Farrand ed., 1911) (Roger Sherman's comment that the foreign-commerce power is an "object[] of the Union"); *id.* at 413 (James Wilson's comment that the foreign-commerce

9

at 960, or (2) Congress's greater power under the Foreign Commerce Clause than under the Interstate Commerce Clause to regulate commerce inside the several states.[7] They offer no

power "ought to reside in [the federal] government"); *The Federalist No. 42* (James Madison) (explaining that the interstate-commerce power is "supplemental" to the foreign-commerce power because the former ensured that the several states would not tax each other's goods, which would cause the states "to resort to less convenient channels," e.g., sovereign nations, "for their foreign trade," and it is the province of the federal government "to regulate the intercourse with foreign nations"); *Japan Line*, 441 U.S. at 448, 450 (striking down California law that applied ad valorem property tax on cargo contained aboard Japanese ships temporarily docked in California ports because "[f]oreign commerce is preeminently a matter of national concern"). *See also Brown v. Maryland*, 25 U.S. 419, 445–46 (1827) (recognizing that the foreign-commerce power is in "the control" of "a single [federal] government").

[7] *See, e.g.*, 2 *The Debates in the Several State Conventions*, *supra* note 5, at 350 (Alexander Hamilton's comment that the foreign-commerce power relates to "the whole system of foreign intercourse," without mention of its extraterritorial application); 3 *id.* at 213 (James Monroe's comment on how "commerce" involves trade relationships); 4 *id.* at 18 (William Richardson Davie's comment on how the foreign-commerce power should be used to compel trade relationships); *The Federalist No. 42* (James Madison) (as his only example of the foreign-commerce power, stating that the power could be used "to prohibit . . . the importation of slaves [to the United States]"); *Japan Line,* 441 U.S. at 448 n.12 (citing *The*

support for the constitutionality of extraterritorial legislation. *See Baston*, 580 U.S. at 1185 (Thomas, J., dissenting from the denial of certiorari) ("The courts of appeals have relied upon statements by this Court [in *Japan Line* and other cases] comparing the foreign commerce power to the interstate commerce power, but have removed those statements from their context.").

2

The text of the Commerce Clause further supports the conclusion that Congress's foreign-commerce power inside sovereign nations is narrower than its interstate-commerce power inside the several states. While the Foreign and Interstate Commerce Clauses both speak of Congress's power to "regulate Commerce," they feature important prepositional differences: the Foreign Commerce Clause speaks of commerce "*with* foreign Nations," while the Interstate Commerce Clause speaks more broadly of commerce "*among* the several States." U.S. Const. art. I, § 8, cl. 3 (emphases added).

In interpreting this textual difference, *Gibbons* again provides helpful instruction. Chief Justice Marshall explained that the word "among" means "intermingled with." *Gibbons*, 22 U.S. (9 Wheat.) at 194. It connotes that Congress's interstate-commerce power extends inside "the external boundary line of each State." *Id.* Chief Justice Marshall did not define the word "with." But he explained that it means Congress's foreign-commerce power also extends inside "the

---

*Federalist No. 42* and *The Records of the Federal Convention*, which, as explained, support only the Foreign Commerce Clause's domestic application).

11

jurisdictional lines of the several states." *Id.* at 195. Otherwise, he wrote, the foreign-commerce power "would be a very useless power, if it could not pass those lines." *Id.* But telling yet again, Chief Justice Marshall did not state whether Congress's foreign-commerce power extends inside "the jurisdictional lines" of sovereign nations. *Id.* That is because he did not understand Congress to have that power. *Id.* (explaining, as examples of Congress's foreign-commerce power inside jurisdictional lines, that it extends "[to] a foreign voyage [that] may commence or terminate at a port within a State" or "[to] [t]he deep streams which penetrate our country in every direction").

Historical context near the time that the Framers drafted the Foreign Commerce Clause similarly illuminates the text's meaning. The phrase "[c]ommerce with foreign [n]ations" almost identically mirrors the phrase used in Georg Frederich von Martens's 1788 treatise summarizing "the law of nations" from 1748–1788. Georg Frederich von Martens, *Summary of the Law of Nations, Founded on the Treaties and Customs of the Modern Nations of Europe* 145 (William Cobbett trans., 1795) (explaining the meaning of "commerce carried on with foreign nations"). At that time, "[c]ommerce with foreign [n]ations" referred only to a sovereign nation's power inside its territories to regulate commerce with foreign nations; it did not refer to a legislature's power to regulate inside sovereign nations. *Id.* at 145, 148–49 (explaining that the phrase "commerce carried on with foreign nations" means, in part, that "[a] nation is . . . fully authorized . . . [t]o proscribe the manner in which the commerce *with its dominions* shall be carried on," "[t]o prohibit the entry or exportation of certain merchandises," or "[t]o exercise freely its sovereign power over the foreigners living *in its territories*") (emphases added).

12

The Founders were heavily influenced by "the law of nations" and the Supreme Court has used its principles—including Martens's exposition of it—to interpret the scope of the Foreign Commerce Clause. *See, e.g.*, John Scrudato IV, *A Constitution Fit for a Nation: The Influence of the Law of Nations on the Virginia Plan and James Madison's Constitutional Thought*, 31 Yale J.L. & Human. 169, 204 (2020) ("Based on the evidence considered above, there is no question that the role of treaties and the tenets of the Law of Nations were key to the bargains struck at the [Constitutional] Convention."); David M. Golove & Daniel J. Hulsebosch, *The Law of Nations and the Constitution: An Early Modern Perspective*, 106 Geo. L.J. 1593, 1607 (2018) ("The commitment of the Founders, especially the Federalists, to the law of nations is difficult to miss in the historical sources."); *Smith v. Turner*, 48 U.S. (7 How.) 283, 416 (1849) (using Martens's understanding of "the law of nations" to inform Congress's foreign-commerce power, and summarizing only domestic applications of that power).

Based on *Gibbons* and the common understanding of "the law of nations" at the time of the Founding, the Foreign Commerce Clause's text does not countenance Congress regulating inside sovereign nations. Nor does the text of the Foreign Commerce Clause confer greater authority on Congress to regulate inside sovereign nations than the Interstate Commerce Clause confers on Congress to regulate inside the several states.

The majority's textual analysis of the Foreign Commerce Clause misses the mark. To conclude that Congress's foreign-commerce power inside sovereign nations is broader than its interstate-commerce power inside the several states, the majority turns to founding-era definitions of

13

the word "with." Maj. Op. at 17. Specifically, it quotes Samuel Johnson's definition—"noting the means," "in mutual dealing," and "noting connection"—and concludes that Congress may regulate inside sovereign nations if the commerce in question has some "connection" (or link) between the foreign nation and the United States. *Id.* (quoting 2 Samuel Johnson, *Dictionary of the English Language* (1755) (internal quotation marks omitted)). As a description of Congress's ability to regulate inside the United States under the Foreign Commerce Clause, that is correct. *Gibbons*, 22 U.S. (9 Wheat.) at 195.

But respecting Congress's ability to regulate commerce inside foreign nations, the majority's argument is precisely backwards. The Foreign Commerce Clause's preposition, "*with* foreign Nations," in contrast to the Interstate Commerce Clause's more comprehensive formulation, "*among* the several States," means that Congress's power to regulate foreign commerce extraterritorially is lesser—not greater—than its power to regulate interstate commerce. That is because Congress does not have plenary power to regulate *any* foreign commerce, or instrumentalities and channels of foreign commerce, or foreign commerce that arguably affects the United States. The commerce in question must be "with" foreign nations and "with" the United States. Absent that connection, commercial activity occurring within foreign nations, or among foreign nations but not "with" the United States, falls outside the scope of Congress's enumerated power. *See Gibbons*, 22 U.S. (9 Wheat.) at 195 ("enumeration presupposes something not enumerated"); Colangelo, *supra*, at 985–88; Anthony J. Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of*

14

*National and International Law*, 48 Harv. Int'l L.J. 121, 146–51 (2007).

In addition, the majority wrongly compares the Foreign Commerce Clause to the Indian Commerce Clause, Maj. Op. at 17–18, which similarly allows Congress to regulate commerce "with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3. The argument goes that, because the Supreme Court construes the Indian Commerce Clause more broadly than the Interstate Commerce Clause—"provid[ing] Congress with plenary power to legislate in the field of Indian affairs," *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989)—Congress must also possess broad authority under the Foreign Commerce Clause. *See, e.g.*, *Bollinger*, 798 F.3d at 211–12 (making this argument); *Lindsay*, 931 F.3d at 861 (same). But I agree with Judge Hartz that the Indian Commerce Clause says little about Congress's power inside sovereign nations. *Durham*, 902 F.3d at 1243 (Hartz, J., dissenting). Unlike with sovereign nations, the Supreme Court understands "Indian Tribes" to constitute "*dependent* sovereign[s]." *United States v. Lara*, 541 U.S. 193, 203 (2004) (emphasis added). In addition, to support Congress's plenary power over Indian tribes, the Supreme Court has pointed to an amalgamation of constitutional powers—not the Indian Commerce Clause in isolation. *Id.* at 200–01 (referencing "the Indian Commerce Clause," "the Treaty Clause," "the Property Clause," and "preconstitutional powers necessarily inherent in any Federal Government, namely powers that this Court has described as necessary concomitants of nationality" (internal quotation marks and quoted source omitted)); *Haaland*, 599 U.S. at 275 ("Admittedly, our precedent [on Congress's power over Indian tribes] is unwieldy, because it rarely ties a challenged statute to a specific source of constitutional authority."); *see also*

15

Naomi Harlin Goodno, *When the Commerce Clause Goes International: A Proposed Legal Framework for the Foreign Commerce Clause*, 65 Fla. L. Rev. 1139, 1191–92 (2013) ("[I]n discussing the scope of the Indian Commerce Clause, the [Supreme] Court has not relied on or analyzed the Foreign Commerce Clause. Thus, the Indian Commerce Clause legal framework should not be, and has not been, superimposed onto the Foreign Commerce Clause.").

3

Finally, general principles of sovereignty also demonstrate that Congress's foreign-commerce power inside sovereign nations is narrow or non-existent. The Founders had fundamental concerns with a legislature imposing its laws inside sovereign nations. *See, e.g.*, *The Schooner Exch.*, 11 U.S. (7 Cranch) at 136–37 (Marshall, C.J.) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty[.] . . . [Consequently] [t]his full and absolute territorial jurisdiction being alike the attribute of every sovereign, . . . [is] incapable of conferring extra-territorial power[.]"); *The Antelope*, 23 U.S. (10 Wheat.) at 122 (Marshall, C.J.) ("[N]o [nation] can rightfully impose a rule on another."). And that principle applies to the Foreign Commerce Clause's application inside sovereign nations.

The majority argues that the Foreign Commerce Clause is broader than the Interstate Commerce Clause because the former is not constrained by federalism concerns. Maj. Op. 18–19; *see Lopez*, 514 U.S. at 557 ("[T]he scope of the interstate commerce power must be considered in the light of our dual

16

system of government[.]" (internal quotation marks and quoted sourced omitted)). True, federalism concerns are absent in the Foreign Commerce Clause. *Durham*, 902 F.3d at 1205. And it is implausible that principles of federalism and sovereignty are on equal footing in our Constitution; federalism is "an integral part of our constitutional structure" in ways that sovereignty is not. *Id*. But given the Founders' sovereignty concerns (both in the Foreign Commerce Clause and otherwise), the absence of federalism concerns in the Foreign Commerce Clause does not somehow imply that the Foreign Commerce Clause is broader than the Interstate Commerce Clause in all of its applications. *See United States v. Al-Maliki*, 787 F.3d 784, 793 (6th Cir. 2015) ("[A]n unbounded reading of the Foreign Commerce Clause allows the federal government to intrude on the sovereignty of other nations—just as a broad reading of the Interstate Commerce Clause allows it to intrude on the sovereignty of the States.").

\* \* \*

Because Congress's foreign-commerce power inside sovereign nations is narrower than its interstate-commerce power inside the several states, *Lopez* is ill-suited for implementing the Foreign Commerce Clause in this case. We should instead look to the Foreign Commerce Clause's text and original meaning to interpret its scope. *Rife*, 33 F.4th at 843–44. Based on those sources, it appears that Congress lacks *any* power to regulate inside sovereign nations under the Foreign Commerce Clause. *See supra*, at 5–15. Accordingly, § 2423(c)—which purports to regulate a U.S. citizen's or permanent resident's non-commercial conduct inside sovereign nations—does not survive scrutiny. I would thus join the Sixth Circuit and other judges who have determined that § 2423(c) is unconstitutional under the Foreign Commerce

17

Clause. *See, e.g.*, *Rife*, 33 F.4th at 845; *Durham*, 902 F.3d at 1241 (Hartz, J., dissenting); *Clark*, 435 F.3d at 1117 (Ferguson, J., dissenting); *Bianchi*, 386 F. App'x at 163 (Roth, J., concurring in part and dissenting in part).

B. *Pendleton* and the Majority Misapply *Lopez*.

I take issue with *Pendleton* and the majority for an additional reason. Assuming that *Lopez* does apply to the Foreign Commerce Clause for Congress's power to regulate extraterritorially, we erred in *Pendleton* in holding that § 2423(c) satisfies the channels-of-commerce prong. While § 2423(c) is a more comfortable fit under *Lopez*'s substantial-relation prong, as the majority recognizes, I would not analyze the Foreign Commerce Clause under that prong.

1

It is well-settled that, under the first prong, Congress may regulate the use of "the channels of interstate commerce" to prevent "immoral and injurious uses." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964) (internal quotation marks and quoted source omitted). And Congress may regulate non-commercial activity. *Id.* (stating that it does not "make any difference whether the transportation is commercial in character"). However, under this authority, the Supreme Court has affirmed such regulations only in cases where "the person or thing barred from interstate commerce was tainted by either prior immoral conduct or the intent to engage in such conduct upon completion of the journey." *Durham*, 902 F.3d at 1255 (Hartz, J., dissenting) (collecting cases). For example, the Supreme Court upheld regulations where an individual trafficked illegal lottery tickets through the channels of interstate commerce, *Champion v. Ames*, 188 U.S.

18

321 (1903), and where an individual transported women through interstate commerce for purposes of future prostitution, *Hoke v. United States*, 227 U.S. 308 (1913).

Section 2423(c) does not fit into that framework. It requires a defendant neither to have engaged in prior immoral conduct nor to have had an intent to engage in future criminal conduct at the time he travels. *See Bollinger*, 798 F.3d at 218. In essence, "[it] is not really a regulation of channels of commerce at all, but is rather an attempt to 'hook' subsequent conduct by defendants to Congress's foreign commerce authority by tying the conduct to some previous foreign travel." Colangelo, *Foreign Commerce Clause*, *supra*, at 996–97. Stated differently, § 2423(c)'s purported constitutionality is based only in its "jurisdictional hook"—its requirement that an individual traveled at some point in foreign commerce. That does not survive scrutiny under Supreme Court precedent. *See Durham*, 902 F.3d at 1255 (Hartz, J., dissenting); *see also United States v. Rodia*, 194 F.3d 465, 472 (3d Cir. 1999) ("The mere presence of a jurisdictional element . . . does not in and of itself insulate a statute from judicial scrutiny under the Commerce Clause, or render it per se constitutional." (quoting *United States v. Bishop*, 66 F.3d 569, 585 (3d Cir. 1995))).

To be sure, *Pendleton* finds support in SORNA, which we have declared constitutional under *Lopez*'s first prong because of its "jurisdictional hook." *Shenandoah*, 595 F.3d at 160–61, *abrogated on other grounds by Reynolds,* 565 U.S. 432. But I agree with Judge Hartz that SORNA is distinguishable and fits more comfortably under Supreme Court precedent. Under SORNA, the defendant *did* commit a prior unlawful act (a child sex offense) before traveling in interstate commerce. *Durham*, 902 F.3d at 1256 (Hartz, J., dissenting). So the "person . . . barred from interstate

19

commerce was tainted by . . . prior immoral conduct." *Id.* at 1255 (Hartz, J., dissenting). "And the SORNA registration requirement is an incidental condition for permitting such persons to travel in those channels." *Id.* at 1256 (Hartz, J., dissenting).

*Pendleton*'s errors regarding the channels-of-commerce prong are made obvious by their consequences. *Pendleton* "mean[s] that any time a U.S. citizen or permanent resident travels in foreign commerce, every subsequent act by that individual"—commercial or non-commercial—"is within Congress's regulatory authority." Colangelo, *Foreign Commerce Clause*, *supra*, at 1000. Congress could, for example, regulate a U.S. citizen's jaywalking in Toronto, gambling in London, or consumption of foie gras in Paris. *Clark*, 435 F.3d at 1120 (Ferguson, J., dissenting); *Durham*, 902 F.3d at 1263 (Hartz, J., dissenting). The government conceded this point at argument. *See* Oral Arg. Tr. at 29:8–11 (conceding foie gras example). But Congress does not possess "such a general international police power." *Bianchi*, 386 F. App'x at 164 (Roth, J., concurring in part and dissenting in part). "If Congress . . . can regulate virtually anything," then it "is no longer [a branch] of limited and enumerated powers." *Gonzales v. Raich,* 545 U.S. 1, 57–58 (2005) (Thomas, J., dissenting).

The majority's response to this point is unavailing. It finds "compelling" other judges' and scholars' concerns that *Pendleton* "permit[s] Congress to subject an American to federal prosecution for *any* offense committed abroad," but it contends that those concerns "do not apply here" because Clay's crime (a child sexual offense) does not involve "just any offense committed abroad." Maj. Op. at 23 (internal quotation marks and quoted source omitted). That misses the point.

20

Clay's acts were certainly immoral, but *Pendleton*'s reasoning does not stop at sexual offenses under § 2423(c). *Pendleton* answers whether, under *Lopez*'s first prong, Congress may regulate any non-commercial, extraterritorial conduct of whatever nature, solely by virtue of an individual's travel in foreign commerce. 658 F.3d at 310–11. And it answers that question broadly: Congress has carte blanche. *Id.*

2

Section 2423(c) fits more comfortably under *Lopez*'s substantial-relation prong. Under the Supreme Court's interpretation of that prong, Congress may regulate non-commercial and intrastate activity, so long as it "substantially affect[s] interstate commerce." *Lopez*, 514 U.S. at 559. The regulation must be an "essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at 561; *see Raich*, 545 U.S. at 36 (Scalia, J., concurring). The majority properly concludes that § 2423(c), though regulating non-commercial sexual conduct, is "an essential part of a broader scheme to directly regulate" the commercial sex tourism market and thus satisfies *Lopez*'s third prong. Maj. Op. at 29–30 (emphases omitted).

My issue is not with the majority's application of the prong but instead with the prong itself. I agree with the Sixth Circuit that the Supreme Court "depart[ed] from the original meaning of 'commerce'" in *Lopez*'s third prong. *Rife*, 33 F.4th at 843. Originally, "commerce" meant "trade and transportation thereof, as opposed to [non-commercial and intrastate] activities preceding those things." *Id.* at 842; *see Lopez*, 514 U.S. at 585–89 (Thomas, J., concurring) (explaining the historical meaning of "commerce," which is

21

largely uncontested); *see also* Robert G. Natelson, *The Legal Meaning of "Commerce" in the Commerce Clause*, 80 St. John's L. Rev. 789, 805 (2006) ("commerce" meant exchange, traffic, or commercial intercourse); Randy F. Barnett, *The Original Meaning of the Commerce Clause*, 68 U. Chi. L. Rev. 101, 116 (2001) ("commerce" referred to trade or exchange, not all gainful activity). Even assuming the Foreign Commerce Clause as applied extraterritorially is broader than the Interstate Commerce Clause, I see "[no] compulsion to add [*Lopez*'s third prong] to the Foreign Commerce Clause" here. *Rife*, 33 F.4th at 844 (declining to extend *Lopez*'s third prong to the Foreign Commerce Clause). And Supreme Court precedent does not compel us to do so. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) (stating lower courts must follow Supreme Court precedent if it "directly controls" the issue before them); *Baston*, 580 U.S. at 1184 (Thomas, J., dissenting from the denial of certiorari) ("The U.S. Supreme Court has not yet articulated the extent of Congress's power under the Foreign Commerce Clause to enact laws with extraterritorial reach." (internal quotation marks and quoted source omitted)). Without such direction from the Supreme Court, I would refrain from extending *Lopez*'s expansive and unhistorical treatment of the Interstate Commerce Clause to the Foreign Commerce Clause.

## II.   *Holland* and Congress's "Treaty Power"

Because I conclude that Congress does not have the power to enact § 2423(c) under the Foreign Commerce Clause, *Holland*'s misinterpretation of congressional power is troubling here. Article II of the Constitution grants the President the "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur[.]" U.S. Const. art. II, § 2, cl. 2. Article

22

I grants Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." *Id.*, art. I, § 8, cl. 18. "Read together, the two Clauses empower Congress to pass laws necessary and proper for carrying into Execution . . . [the] Power . . . to make Treaties."[8] *Bond*, 572 U.S. at 874–75 (Scalia, J., concurring) (internal quotation marks and quoted source omitted).

In *Holland*, the Supreme Court interpreted the scope of Congress's treaty power. With no analysis whatsoever, it asserted: "If the treaty is valid there can be no dispute about the validity of the statute under Article [I], Section 8, as a necessary and proper means to execute the powers of the Government." *Holland*, 252 U.S. at 432. In other words, the Court declared that Congress not only has the power to help make treaties, but it can also enact laws purporting to implement a valid treaty after it has been made. *Holland* therefore allows Congress to increase its legislative power by treaty when no enumerated power would otherwise authorize its legislation. Nicholas Quinn Rosenkranz, *Executing the Treaty Power*, 118 Harv. L. Rev. 1867, 1868 (2005).

*Holland* is in "deep tension" with the Constitution. *Id.* The "predominant view" regarding the Executive's power to make treaties is that "there are [no] subject-matter limitations whatsoever on that power," *id.* at 1878, other than matters that

---

[8] I will refer to this power as Congress's "treaty power." *See United States v. Lara*, 541 U.S. 193, 201 (2004) (referring to it in that manner).

23

"the Constitution forbids [e.g., rights enshrined in the Bill of Rights]," *Asakura v. City of Seattle*, 265 U.S. 332, 341 (1924) (internal quotation marks and quoted source omitted). If that is true, the Executive could expand the power of the Legislature almost "without limit." Rosenkranz, *supra*, at 1893; *Bond*, 572 U.S. at 878 (Scalia, J., concurring). Under *Holland*, Congress need not adhere to the Constitution's "basic . . . scheme of enumerated legislative powers" but instead may legislate via treaty. Rosenkranz, *supra*, at 1894; *see also Bond*, 572 U.S. at 874–76 (Scalia, J., concurring) (explaining that the *Holland* Court misread the plain text of the Congress's treaty power, which allows Congress to pass laws necessary and proper only to *make* a treaty, not *implement* it).

That issue is front and center here. Other than the Foreign Commerce Clause, the government does not rely on any enumerated power to justify § 2423(c)'s constitutionality, instead relying only on the treaty power.[9] That argument

---

[9] In a footnote, the majority suggests that "nationality-based jurisdiction" may justify § 2423(c)'s constitutionality, though neither party presented that argument in briefing. Maj. Op. at 9–10 n.3. "Nationality-based jurisdiction" is a doctrine rooted in international law holding that a nation's legislature may prosecute its citizens for crimes committed abroad, solely by virtue of their citizenship. Geoffrey R. Watson, *Offenders Abroad: The Case for Nationality-Based Criminal Jurisdiction*, 17 Yale J. Int'l L. 41, 42 (1992). That principle is troubling here for many reasons. No enumerated power in *our* Constitution supports the doctrine. *Id.* at 63. Nor did the Founders recognize it; they expected only that "the United States [would] . . . exercise criminal jurisdiction over crimes committed in U.S. territory[.]" *Id.* at 44–45 (citing sources discussing the history). In addition, the few early-1900s

prevails under *Holland* because, as the majority properly concludes, § 2423(c) has a "rational[ ] relat[ionship]" to a treaty—the so-called Optional Protocol. *United States v. Comstock,* 560 U.S. 126, 134 (2010). However, our Constitution's scheme of enumerated legislative powers cannot bear the weight of *Holland*. The treaty power is simply a "power to 'make Treaties' that are consistent with provisions of the Constitution allocating federal governmental power and that do not violate prohibitory provisions of the Constitution framed broadly enough to apply to the treaty-making authority." Gary Lawson & Guy Seidman, *The Jeffersonian Treaty Clause*, 2006 U. Ill. L. Rev. 1, 56 (2006). Treating the Article II treaty power as a source of unbounded legislative power independent of the Constitution's overall structure of carefully enumerated powers is anomalous, at best. As other judges have, I respectfully urge the Supreme Court to clarify the scope of *Holland* and its place in our constitutional design. *See, e.g.*, *Bond*, 681 F.3d at 169 (Ambro, J., concurring); *Rife*, 33 F.4th at 845–48; *Park*, 938 F.3d at 375 (Griffith, J., concurring).

---

Supreme Court cases purportedly invoking the doctrine involved cases where the individual's crime *directly* implicated the United States. *See, e.g.*, *Blackmer v. United States*, 284 U.S. 421, 436–38 (1932) (involving U.S. citizen, residing in Paris, who refused to comply with subpoena to return to the United States to testify in the Supreme Court of the District of Columbia); *United States v. Bowman*, 260 U.S. 94, 99–102 (1922) (applying extraterritorially a statute that made it criminal offense to conspire to defraud a corporation owned by the United States government). That is not the case with § 2423(c).

\* \* \*

*Pendleton* and *Holland*, though flawed, compel our judgment here. So I respectfully concur.

AMBRO, *Circuit Judge*, concurring

I agree with my colleagues that our decision in *United States v. Pendleton*, 658 F.3d 299 (3d Cir. 2011), and the Supreme Court's decision in *Missouri v. Holland*, 252 U.S. 416 (1920), preclude Clay's facial and as-applied challenges to 18 U.S.C. §§ 2423(c) and (g)(1) (denominated as (f)(1) before December 22, 2023). I also agree with Judge Hardiman that the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549 (1995), provides the analytical framework for evaluating Congress's exercise of its power under the Foreign Commerce Clause. And I agree with his conclusion that §§ 2423(c) and (g)(1) are constitutional exercises of that power under the substantial-effects prong because criminalizing conduct like Clay's, though noncommercial, is an "essential part of a larger regulation of economic activity"—international sex tourism—and because that "regulatory scheme could be undercut unless the [foreign] activity were regulated." *Lopez*, 514 U.S. at 561.

I disagree with Judge Hardiman, however, in one respect. I believe, as Judge Porter explains well, that §§ 2423(c) and (g)(1) fail to satisfy *Lopez*'s channels-of-commerce prong. Under *Pendleton*'s logic, Congress's authority to regulate the conduct of American residents abroad is seemingly boundless. I also join Judge Porter in continuing to "urge the Supreme Court to clarify the scope of *Holland* and its place in our constitutional design." Porter Concurrence Op. at 24 (citing *United States v. Bond*, 681 F.3d 149, 169 (3d Cir. 2012) (Ambro, J., concurring)).

Despite these reservations, I recognize that *Pendleton* and *Holland* bind us, and so I respectfully concur.

1